Filed 6/19/14; pub. order 7/10/14 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re G.P. et al., Persons Coming Under the Juvenile Court Law. | |
| | D064965 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J514402B-C) |
| v. | |
| Y.Z. et al., | |
| Defendants and Appellants. | |

APPEAL from a order of the Superior Court of San Diego County, Garry G.

Haehnle, Judge. Affirmed.

Andrea R. St. Julian, under appointment by the Court of Appeal for Defendant and

Appellant Y.Z.

Valerie N. Lankford, under appointment by the Court of Appeal for Defendant and

Appellant Jose P.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Tilisha Martin, under appointment by the Court of Appeal, for Minors.

Y.Z. (Mother) appeals a juvenile court order terminating her parental rights to her children, G.P. and A. P., and choosing adoption as the appropriate permanent plan under Welfare and Institutions Code[1] section 366.26. Mother contends the court's erroneous finding that the children should be removed from their relative caregiver and placed in a foster home under section 387 deprived her of the ability to raise an exception to the adoption preference under section 366.26, subdivision (c)(1)(A). Mother also challenges the sufficiency of the evidence to support the court's finding that the beneficial relationship exception to the adoption preference is inapplicable.

Jose P., the presumed father of G.P. and A.P. (Father), joins Mother's arguments and maintains his due process rights were violated when the court terminated his parental rights without having made a detriment finding as to him.

We conclude the court's findings under section 387 as well as its determination that the beneficial relationship exception did not apply are supported by substantial evidence. We also find that Father invited the error he now appeals, and even if he did not do so, the juvenile court's findings were sufficient to support termination of Father's rights. Accordingly, we affirm.

---

1    Statutory references are to Welfare and Institutions Code unless otherwise specified.

FACTUAL AND PROCEDURAL HISTORY

On September 26, 2011, the San Diego County Health and Human Services Agency (Agency) filed petitions on behalf of G.P. and A.P., ages five and two respectively. Filed under section 300, subdivision (b), the petitions alleged Mother's excessive use of methamphetamine placed the brothers at a substantial risk of suffering serious physical harm because her drug abuse and history of substance abuse rendered Mother unable to provide the children with regular care. The petitions also alleged Mother admitted to on-going weekly drug use and she tested positive for methamphetamine on September 15.

In the September 26, 2011 detention report, social worker James Marcuzzo reported this was not G.P.'s first dependency experience. He was taken into protective custody in May 2008 when his parents were arrested, both for possession of dangerous drugs and probation violations. Drugs and drug paraphernalia were found in the family home accessible to the child. Mother ultimately reunified with G.P. after successfully completing her case plan. However, Father remained in prison. Mother also had a prior dependency case with her oldest child, Angelica M., in 2002. The case began with family maintenance while Mother and Angelica lived in the KIVA[2] substance abuse

---

[2] KIVA is a residential substance abuse treatment program for substance abusing women and their children. Services include assessment, educational workshops in topics such as life skills, vocational training, health, and relapse prevention as well as treatment planning, individual and group counseling, and parenting instruction. KIVA is part of the McAlister Institute of Treatment and Education (MITE).

program. However, Mother was eventually arrested in March 2004, failed to reunify with Angelica, and Angelica's father was granted sole physical and legal custody of her.

According to Marcuzzo, on September 15, 2011, the Agency became concerned Mother may have been producing methamphetamine in her home. Chula Vista police investigated the home 11 times during the year, the majority of which were for suspected drug use on the premises. During an interview Mother claimed, however, the maternal grandmother and the children had made false allegations against her because of her history of drug use. She also disclosed she had video cameras set up outside her home because of her fear of retaliation, the result of prior involvement with criminal activity and the "Mexican Mafia."

Marcuzzo reported when he interviewed Mother she presented as a person who was drug free. However, though she claimed she had not been using illegal substances, both Mother and her boyfriend tested positive for methamphetamine with drug levels consistent with chronic binge use. Mother then acknowledged she had been using drugs three times a week during the previous six months, generally just prior to the children returning home from school.

Marcuzzo reported he also interviewed G.P. on September 15 at the Palomar Elementary School. G.P. reported he lived with his mother, brother, and "[P]apa Mike." He also reported "Grandpa Rick" visited regularly, but he did not like "Grandpa Rick" because he made him smoke a cigarette. G.P. described the cigarette as red and white and "as long as a pen." The child also reported all the adults smoked "small cigarettes and the big cigarette" that was hard, yellow and purple, and made out of a bottle.

4

Nevertheless, Marcuzzo recommended the children remain in Mother's care while she engaged in family maintenance services.

Mother appeared at the detention hearing held September 27, 2011, and filed parentage inquiry questionnaires for both G.P. and A.P. in which she identified Father as the boys' father. The court did not follow the Agency's placement recommendation, but, instead, ordered the children detained at the Polinsky Children's Center or in an approved foster home.

In the October 19, 2011 jurisdiction and disposition report, social worker Loretta De Cunzo reported the Agency had placed G.P. and A.P. with their maternal aunt Natalie Z. and it appeared they were appropriately cared for. De Cunzo also reported Mother disclosed Father was incarcerated in a federal prison in Indiana until May 2019 on drug charges involving a Mexican drug cartel. However, De Cunzo was unable to verify Father's whereabouts through the federal and state prison locators.

De Cunzo had no doubt Mother loved her children yet her continued drug use placed G.P. and A.P. at serious risk of harm. Therefore, De Cunzo recommended the court continue the children in out-of-home care and order Mother to participate in reunification services. De Cunzo recommended Mother participate in a case plan comprised of general counseling, a psychological evaluation, parenting education, and substance abuse services, including an outpatient substance abuse program, attendance at a minimum of two 12-step meetings weekly, and on demand drug testing.

The court held the jurisdiction and disposition hearing on October 19, 2011, and found the petition allegations true and also found the Agency had made reasonable efforts

to locate Father and notify him of the proceedings, all findings made by clear and convincing evidence. The court then ordered: (1) the Agency to continue its search efforts to locate Father, (2) G.P. and A.P.'s placement with Natalie continued, and (3) Mother to participate in the dependency drug court in addition to her current services.

In the six-month status review report dated April 17, 2012, De Cunzo reported that Father's whereabouts remained unknown and G.P. and A.P.'s placement with Natalie continued to be appropriate. In the meantime, Mother entered the South Bay Women's Recovery Center in October 2011 where she completed seven of 14 parenting classes and attended drug treatment three times weekly. However, during the reporting period Mother missed several treatments and failed to drug test four times. She did, however, drug test on April 9, 2012, with negative results.

On February 9, 2012, Mother completed a psychological evaluation with Christopher Carstens, Ph.D. Carstens diagnosed Mother as being amphetamine or amphetamine-like dependent as well as having parent-child relationship problems. Though Carstens acknowledged that people do sometimes recover completely from methamphetamine abuse, he expressed concern that, because of Mother's comments, she was not committed to long-term sobriety or long-term avoidance of people who lead her to substance abuse. Carstens opined that could change over the ensuing six months.

The court held the six-month review hearing on April 17, 2012, found Mother had made some progress with the provisions of her case plan, and ordered the Agency to provide her with six additional months of services. The court also continued the children's placement with Natalie.

6

In the October 16, 2012 status review report, De Cunzo reported G.P. and A.P. continued to live with Natalie and appeared comfortable and well cared for. In the interim, Mother continued to attend the South Bay Women's Recovery program once a week and remained employed by a South Bay insurance company. Additionally, though she was provided referrals for individual therapy as early in this dependency as November 2011 and again in June 2012, Mother did not engage in therapy until August 30. Father's whereabouts remained unknown.

According to De Cunzo, the Agency granted Mother short unsupervised visits in late August 2012. In earlier supervised visits, Mother was observed to be loving and affectionate towards G.P. and A.P. She provided snacks, gave both children individual attention, and took their lead in play activities. De Cunzo noted what while Mother had made a good start at addressing her drug use through treatment and negative testing, she had not yet demonstrated she had gained insight into the cause of her drug use. De Cunzo opined Mother needed to explore her triggers and red flags and develop a viable relapse prevention plan. Nevertheless, Mother reported if she could not reunify with G.P. and A.P., she wanted them placed with either of their maternal aunts, Natalie or Claudia E.

In the March 21, 2013 status review report, social worker Christina Morse stated the children's caregiver, Natalie, telephoned her to report Mother had been beaten up by her ex-boyfriend Michael E. Additionally, Natalie disclosed Michael had transported G.P. and A.P. to her home on January 1 in violation of the court's no contact order issued in September 2011. When contacted, Mother denied she had been involved in a domestic

7

violence incident or that the children had been in the presence of Michael in violation of the court's order. However, according to the police report, Michael punched Mother on her face and chest and pulled her hair repeatedly. Additionally, G.P. and A.P. disclosed they had spent Christmas Eve and Christmas day with Mother and Michael and that they argued at times. As a result, Morse suspended Mother's overnight visits with the boys.

On January 18, 2013, Morse met with Mother at her home. During the ensuing conversation Mother acknowledged Michael had contact with G.P. and A.P. during the Christmas holiday and disclosed that she and Michael had gotten married in April 2012 while he was still in prison. Mother agreed to have no further contact with Michael or any of his friends or acquaintances and to obtain a restraining order as soon as possible. She also agreed to participate in domestic violence treatment when referred and to submit to a drug test that day, but later claimed she could not test because she lost her identification.

On January 21, 2013, Mother informed Morse of a second domestic violence incident with Michael that occurred the day before. Mother reported Michael had held her in her home against her will and would not allow her to open the door when Chula Vista police arrived. Police eventually forced their way into the home and arrested Michael. According to Mother, the court issued her a temporary restraining order earlier that same day.

On February 25, 2013, Morse met with Mother to discuss her relationship with Michael. Mother claimed Michael sought help from his probation officer but received none. She also claimed Michael loved her, wanted to be with her and the children, and

she loved him and could not abandon him.  Because Mother violated the court's order of protection on at least three occasions and exposed the children to violence between her and Michael, Morse concluded she could not protect G.P. and A.P. from emotional abuse.  Morse noted Mother lied to the Agency and the court about the extent of her ongoing relationship with Michael.  She had not demonstrated she was able to successfully complete a domestic violence treatment program or develop a detailed domestic violence safety plan.  Morse recommended Mother's visitation remain supervised, that the court terminate her reunification services, and schedule a selection and implementation hearing.

In the April 4, 2013 addendum report, Morse reported Mother completed the South Bay Women's Recovery Center's drug program on November 2012, and although the center offered her recommended aftercare, she rejected the offer.  Morse attempted to contact Mother to request she drug test but was unsuccessful.  Additionally, after completing one domestic violence treatment group class, Mother failed to return to the program.

The court held the 18-month permanency review hearing on April 4, 2013, and found Mother had not made substantive progress with the provisions of her case plan.  Thus, there was not a substantial probability G.P. and A.P. would be returned to Mother's physical custody within the subsequent six months because to do so would be detrimental to the children's physical and emotional well-being.  The court found the Agency had offered or provided Mother reasonable services, terminated services, continued the children's placement with Natalie, and scheduled a selection and implementation hearing.

9

In the April 25, 2013 addendum report, social worker Robyn Santana reported the Agency located Father in the federal correctional institution in Terre Haute, Indiana. Father reported he was not aware the children were in foster care and requested an attorney be appointed to represent him. He further stated he had been incarcerated since 2009 and would be until 2019, and that he might be deported to Mexico once he was released.

The court held a special hearing on April 25, 2013, appointed counsel to represent Father as he requested, and arranged for him to appear telephonically. The court found it was not required to make a detriment finding as to Father because Father had not requested custody of the children, and Father's counsel told the court that such a finding would not be appropriate. The court ordered Father have supervised visits with G.P. and A.P. in accordance with the rules and regulations of the facility in which he was incarcerated. The court also ordered telephonic visits with the children be supervised.

In the July 31, 2013 section 366.26 assessment report, social worker Lengpea Yang reported G.P. and A.P. remained placed with Natalie where they had been since September 30, 2011. Yang had been able to observe only four visits between Mother and her children because the inability to reach Mother by telephone made scheduling difficult. Telephone calls went directly to Mother's voice mail and Yang could not leave messages because her mail box was constantly full.

Yang reported G.P. and A.P. were typically ready and waiting to go to their visit and left their caregivers willingly. When they arrived at the visits, the children appeared happy to see their mother, smiled and yelled "Mommy." At the first visit, Mother forgot

10

to bring juice because she was in a rush to get to the visit on time, but did bring pop tarts for the boys. She promised she would bring juice for the second visit, but on the next visit, she failed to arrive with any snacks. G.P. was hungry so Yang shared her granola bar with him.

For the third visit, Mother brought pizza and juice. Throughout the visit, Mother followed each child's lead in play and both children were talkative. Yang opined G.P. and A.P. were comfortable in their mother's presence. At the end of the visit, the children kissed and hugged Mother goodbye, but neither displayed any emotional distress when they separated or during the ride back to the caregiver's home.

Yang concluded G.P. and A.P. were likely to be adopted if the court terminated parental rights. The children were specifically adoptable because their maternal aunt, Claudia, living in Nevada, was very interested in adopting them and had begun the process of obtaining an out-of-state contingent home study. If, for some reason, Claudia could not adopt G.P. and A.P., there were 19 approved San Diego County families interested in adopting the boys together.

Yang noted this was the second dependency G.P. and A.P. had been through because of the same protective issues, and the Agency remained concerned for the children's safety. While Mother did complete a drug treatment program, she could not identify any of the 12 steps of the recovery model, though she claimed she had worked on the first three steps. Therefore, Yang recommended the court identify adoption as the children's preferred permanent plan.

Yang reported she assessed Mother's relationships with G.P. and A.P. by comparing the strength and quality of the relationships with the benefits of adoption. In doing so, Yang opined Mother had not been able to consistently demonstrate she could meet her children's needs. She could not provide them with a safe and stable home environment, and she exposed them to domestic violence while violating a court order she stay away from Michael. Yang did note that during visits Mother displayed some parenting skills with the children and expressed both physical and verbal affection towards them. However, Mother had not served in a parental role to the children for nearly two years. Though G.P. and A.P. had a good time visiting with Mother, in Yang's opinion, they did not view her as a primary parent who filled their needs.

Yang concluded the benefits of adoption outweighed the benefits of maintaining the relationships G.P. and A.P. had with Mother. Adoption provided the children with safety and the stability of being a permanent part of a family. Therefore, Yang recommended the court terminate all parental rights and order adoption as the children's permanent plan.

In the July 31, 2013 addendum report, Yang reported that Father had requested his mother, Mrs. V., and sister, Mrs. C., be assessed for G.P. and A.P.'s possible placement. After several unsuccessful attempts at contacting Mrs. V. and Mrs. C., a relative home assessment worker learned from Mrs. C. that she and Mrs. V. lived together and were unable to care for G.P. and A.P. Yang also reported Claudia continued to work with the State of Nevada to complete her home study for placement. Yang reported she asked the

12

children how they felt about the possibility of living with Claudia in Nevada and they responded, "That would be great!"

In the August 29, 2013 addendum report, Yang reported her observations garnered from Mother's three visits with G.P. and A.P. over the previous 45 days. On the first visit, the children greeted Mother by asking if she had brought food. However, as was the case on several occasions in the past, Mother had not done so, claiming she had run out of time. When later in the visit Mother asked G.P. for a hug, he ignored her and continued to read a comic book. On the next visit, Mother was 20 minutes late, claiming she had to stop at the store to pick up food. However, on the last visit, Mother once again failed to provide snacks for the boys, prompting G.P. to ask Yang if she had a granola bar. G.P. later asked Mother to buy them a snack from the office vending machine. While Mother was gone, the boys spoke with their attorney's investigator and talked about the time they spent with Claudia and their cousins.

Yang reported Claudia had not completed Nevada's ICPC[3] requirements to have G.P. and A.P. placed in her home. Additionally, Yang discussed permanent plan options with the children's caregiver, Natalie, who expressed interest only in assuming legal guardianship of the boys if Claudia could not adopt them.

On September 27, 2013, the Agency filed supplemental section 387 petitions on behalf of G.P. and A.P. alleging their placements with Natalie were no longer appropriate

---

[3]     ICPC is an acronym for Interstate Compact on the Placement of Children.

because two days earlier the caregiver asked that the children be removed, as she could no longer care for them.

According to the September 27, 2013 detention report, in June, Natalie reported she and her boyfriend Isaac were not interested in caring for G.P. and A.P. long term. At that time it was unclear if the ICPC for Claudia would be approved, and Natalie said she and Isaac would assume guardianship of the boys only if it was not. In late August, Yang informed Natalie the ICPC was not complete, but for Relative Home Assessment (RHA) to approve the boys' placement with her, she and Isaac would have to find another residence. Yang explained RHA could not approve the placement because Natalie lived on the same property as Mother, who had a criminal and child protective services history. Additionally, the boys' maternal grandmother, who also lived on the same property, refused to cooperate with the Agency and submit to live scan testing.

Yang reported during the first week in September 2013 Natalie informed her she and Isaac could no longer care for G.P. and A.P. Natalie explained Isaac had lost his job and they could not afford to move from the family property, which she partially owned and where she did not have to pay rent. However, Natalie expressed her willingness to work with the Agency to find G.P. and A.P. "the most permanent placement" available. On September 24, Natalie reported though she and Isaac wanted to continue to care for the children, Isaac was beginning to train for a new job in Texas the next day and the children had to be removed immediately. Natalie said once Isaac completed his 90-day probationary period, she would join him in Texas and within 30 days find a suitable residence for the family. She wanted G.P. and A.P. placed in foster care, but returned to

14

her and Isaac once they were settled. Therefore, on September 25, the Agency removed the children from Natalie's home and placed them with a confidential licensed foster family.

The court held the detention hearing on the section 387 petition on October 1, 2013, and confirmed its findings that the Agency had made a prima facie showing the allegations were true by clear and convincing evidence. The court ordered G.P. and A.P. detained in an approved confidential foster home and confirmed all prior visitation orders.

In the October 8, 2013 addendum report, Yang reported since August 29 she had observed four visits between the children and Mother. Visits were held weekly and after August 29 had been increased from one hour to two. Prior to two visits, G.P. said he no longer wanted to visit with Mother. A.P. expressed similar feelings before a visit in October. However, with minimal encouragement, the children agreed to attend visits. Yang explained that Mother brought snacks and toys to the visits. The children typically ate snacks while talking about their week. Once finished, G.P. usually ran to the monkey bars and played alone or with other children at the park. On the second visit, Mother asked G.P. to spend the last 10 minutes of the visit with her, but he refused, and on the third visit, A.P. wanted to be alone for the last 20 minutes of the visit.

Yang noted that while Mother had demonstrated some parenting skills during visits with G.P. and A.P., she had not been a parent to the children for the previous two years. Although G.P. and A.P. appeared to enjoy visits with Mother earlier in the dependency, Yang observed their feelings had begun to change. She opined the children

15

did not view Mother as their primary parent, but instead, viewed her more as a friendly visitor. The children looked forward to visits because Mother provided snacks and gifts, but Yang believed those benefits from the parent-child relationship did not outweigh the benefits adoption would provide. Therefore, Yang recommended the court terminate the parents' parental rights and order G.P. and A.P.'s permanent plan be adoption.

On October 8, 2013, the court held the combined jurisdiction and disposition hearings on the Agency's section 387 petitions and the contested selection and implementation hearing pursuant to section 366.26. The court first proceeded with a document trial as to jurisdiction on the section 387 petitions and received in evidence the Agency section 366.26 assessment report and the addendum report both dated July 31, the September 27 detention report, Yang's curriculum vitae, and her stipulated testimony.

According to her curriculum vitae, Yang held a bachelor's degree in both human development and psychology and a master's degree in social work. She became employed by the Agency as a protective services worker in October 2012 and since has completed the 131-hour Public Child Welfare Training Academy instructional program as well as 106 hours of Agency generated instruction, including but not limited to specialized training in such disciplines as permanent placement assessment, visitation for adoptions, guardianship training, and investigation.

Per her stipulated testimony, Yang was assigned this case on April 26, 2013. Once she was able to reach Mother and arrange visitation, Mother visited with G.P. and A.P. once weekly for one hour. She did not ask for additional visits until August 29 nor

16

did she ask for telephonic visits until September 25. Yang extended the visits to two hours and provided Mother with the foster parents' telephone number.

Yang's stipulated testimony included that the boys were in a foster home with parents who had no criminal or child protective services history, had an approved adoptive home study, and wanted to adopt G.P. and A.P. However, they were not interested in guardianship. According to Yang, the foster parents were willing to facilitate ongoing contact between the boys and their biological relatives including Mother.

Yang also would have testified that on their first night in the foster home G.P. and A.P. asked to telephone Natalie but not Mother. She opined G.P. saw Mother more as a friendly visitor than as a parent. Though G.P. showed affection toward Mother at visits, he rarely initiated it and separated easily from her when visits ended. Though A.P. appeared closer to Mother than G.P., he too separated easily when visits were over.

Yang stated G.P. and A.P. would not have been greatly harmed if they could no longer have contact with Mother. In that regard, Yang opined the benefits of adoption outweighed those of maintaining the children's relationships with Mother. In reaching her opinion, Yang considered, among other things, the boys' ages, the fact that this was their second trip though the dependency system, that Mother failed to reunify with another child, Mother's drug history, and her recent contact with her husband, Michael. Yang believed G.P. and A.P. deserved a permanent plan of adoption, not long-term foster care.

The court considered the documents and stipulated testimony received in evidence and the arguments of counsel and found the allegations of the section 387 petitions true by clear and convincing evidence. Therefore, the court continued G.P. and A.P. in their licensed foster home placement.

The court then proceeded to the selection and implementation hearing and received all evidence previously received for the purpose of the section 387 hearing. Mother offered stipulated testimony that if called as a witness she would have testified she loved her children very much and believed they loved her and were bonded to her. She also would have testified she believed it would have been detrimental to G.P. and A.P. to terminate her parental relationship with them.

After considering the evidence before it as well as oral argument from counsel, the juvenile court found G.P. and A.P. were both generally and specifically adoptable and that the children would be adopted if parental rights were terminated. The court further found the beneficial relationship exception to adoption found in section 366.26, subdivision (c)(1)(B)(i) did not apply, and therefore it terminated all parental rights of both Mother and Father and freed the children for adoption.

On November 14, 2013, Father and Mother filed notices of appeal.

## DISCUSSION

### I

### *SECTION 387*

Mother and Father argue the court erred in making true findings on the Agency's section 387 supplemental petitions and removing G.P. and A.P. from Natalie's home.

18

Mother and Father contend that the error deprived them of the opportunity to argue the applicability of the exception to adoption found in section 366.26, subdivision (c)(1)(A) at the subsequent selection and implementation hearing. We reject these contentions.

When the Agency seeks to change the placement of a dependent child from relative care to a more restrictive placement, such as foster care, it must file a supplemental petition under section 387. A supplemental petition "shall contain a concise statement of facts sufficient to support the conclusion that the previous disposition has not been effective in the rehabilitation or protection of the child or, in the case of a placement with a relative, sufficient to show that the placement is not appropriate in view of the criteria in Section 361.3." (§ 387, subd. (b).)

Under section 387, the Agency has the burden to show by a preponderance of the evidence that the factual allegations alleged in the petition are true. If the court finds the factual allegations are true, then the court determines whether the previous disposition is no longer effective in protecting the child or whether placement with the relative is not appropriate in view of the criteria in section 361.3. (§ 387; *In re Miguel E.* (2004) 120 Cal.App.4th 521, 542 (*Miguel E.*); Cal. Rules of Court, rule 5.56(a), (e);[4] see *In re Javier G.* (2006) 137 Cal.App.4th 453, 460-461.)

In determining whether the child's placement with a relative is appropriate, section 361.3, subdivision (a), directs the social worker and the court to consider, but not be limited to, all the following criteria:

---

4      All further rule references are to the California Rules of Court.

"(1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs.

"(2) The wishes of the parent, the relative, and child, if appropriate.

"(3) The provisions of Part 6 (commencing with Section 7950) of Division 12 of the Family Code regarding relative placement.

"(4) Placement of siblings and half siblings in the same home, if that placement is found to be in the best interest of each of the children as provided in Section 16002.

"(5) The good moral character of the relative and any other adult living in the home, including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect.

"(6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification is unsuccessful.

"(7) The ability of the relative to do the following:

"(A) Provide a safe, secure, and stable environment for the child.

"(B) Exercise proper and effective care and control of the child.

"(C) Provide a home and the necessities of life for the child.

"(D) Protect the child from his or her parents.

"(E) Facilitate court-ordered reunification efforts with the parents.

"(F) Facilitate visitation with the child's other relatives.

"(G) Facilitate implementation of all elements of the case plan.

"(H) Provide legal permanence for the child if reunification fails. [¶] However, any finding made with respect to the factor considered pursuant to this subparagraph and pursuant to subparagraph (G) shall not be the sole basis for precluding preferential placement with a relative.

20

"(I) Arrange for appropriate and safe child care, as necessary.

"(8) The safety of the relative's home.  For a relative to be considered appropriate to receive placement of a child under this section, the relative's home shall first be approved pursuant to the process and standards described in subdivision (d) of Section 309."[5]

If the court finds the previous disposition is no longer effective or the placement with the relative is not appropriate, then, in a separate disposition phase, the court must determine whether removal of the child from his or her placement is required.  (Rule 5.565(e)(2); *Miguel E.*, *supra*, 120 Cal.App.4th at p. 542; *In re Jonique W.* (1994) 26 Cal.App.4th 685, 691.)

We review a decision to remove a child from a relative caretaker under the substantial evidence test.  (*In re A.O.* (2004) 120 Cal.App.4th 1054, 1061.)  We evaluate the evidence in the light most favorable to the trial court's determinations, resolve all evidentiary conflicts in favor of the prevailing party, and indulge in all reasonable inferences to uphold the trial court's findings.  (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.)  We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.)

---

[5]     For a relative to be considered appropriate to receive placement in the first instance, the relative's home must be approved according to the process and standards described in section 309, subdivision (d), which requires the Agency to conduct an in-home inspection regarding safety and the relative's ability to care for the child, and to check adult household members for criminal records and prior allegations of child abuse or neglect.  (§ 361.3, subd. (a)(8); see § 309, subd. (d).)  The approval of the relative's home is based on the standards set forth in regulations for family foster care licensing, which include standards of safety and sanitation for the home and standards for basic personal care, supervision, and services provided by the caregiver.  (§ 309, subd. (d)(2); see *Miguel E.*, *supra*, 120 Cal.App.4th at pp. 541-542.)

21

The burden is on the party or parties challenging the findings and orders of the trial court to show there is no evidence of a substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

In its section 387 supplemental petition, the Agency alleged on or about September 23, 2013, the placement with the relatives was no longer appropriate in view of the criteria in section 361.3 in that the relative caregivers asked that the child be removed as they could no longer care for the child. The factual basis of the supplemental petition is that Natalie stated she could no longer care for G.P. and A.P.

We are satisfied that the juvenile court's findings of fact are supported by substantial evidence. Following the September 27, 2011 detention hearing, the Agency placed G.P. and A.P. with Natalie, who cared for the children along with her boyfriend, Isaac. However, in June 2013, Natalie told the Agency that she and Isaac were not interested in caring for the children long term. At that time, Natalie's sister, Claudia, residing in Nevada, had expressed interest in adopting the boys and had initiated the process of obtaining an out-of-state contingent home study. However, in late August, as the ICPC process continued, it became unclear if Nevada would approve Claudia's home study for placement because of the result of Claudia's live scan. Natalie then informed the Agency she and Isaac would assume guardianship of G.P. and Armando if Claudia could not be approved to adopt the boys.

At the beginning of September 2013, the Agency requested Natalie participate in TDM to discuss G.P. and A.P.'s placement. Shortly thereafter, Natalie explained Isaac had lost his job and they had to remain on the family property, where they paid no rent.

22

Unfortunately, Mother and her mother, who refused to submit to a live scan to determine if she had background issues of concern, also lived at the family property. Accordingly, RHA could not approve the residence for placement of G.P. and A.P. The Agency told Natalie that if she and Isaac wanted to be approved for guardianship of the boys, she would have to move to a new residence.

Later in September, Isaac informed the Agency that he had received a job offer in Texas, was starting training there within the next few days, and there would be nobody to care for G.P. and A.P. while Natalie was at work. Isaac was explicit that the boys needed to be removed in the very near future.

The next day, Natalie spoke with Yang and told her that the Agency had to remove G.P. and A.P. by the next morning. She confirmed that there would be nobody at home to care for G.P. and A.P. while she was at work, and despite Yang's attempt to explore other options for childcare, Natalie insisted she had no viable alternative. She said she wanted the children placed in foster care, but once she and Isaac were settled in Texas in about four months, she wanted the boys returned. However, she also expressed her willingness to work with the Agency to find G.P. and A.P. "the most permanent placement" available.

Mother and Father argue the juvenile court did not consider Natalie's and Isaac's desire that G.P. and A.P. be placed with them once they got settled in Texas. This argument requires us to reweigh the evidence. We cannot do so. (See *In re S.C.*, *supra*, 138 Cal.App.4th at p. 415.) Mother and Father's contention also ignores the ambiguity in the record regarding Natalie's and Isaac's desire to care for the boys on a long-term basis.

23

For example, Natalie told a social worker that she did not want to care for G.P. and A.P. long term. She also expressed her desire to work with the Agency to find a the "most permanent placement available" for the boys. Thus, although both Natalie and Isaac expressed a desire to have the boys placed back with them sometime in the future, after they were established in Texas, it is unclear if they intended to permanently care for the boys. Simply put, Mother and Father have not carried their burden of showing the court's finding under section 387 was not supported by substantial evidence.

## II

### *THE BENEFICIAL RELATIONSHIP EXCEPTION*

The juvenile court may terminate parental rights if there is clear and convincing evidence of adoptability. (§ 366.26, subd. (c)(1).) After the court determines a child is likely to be adopted, the burden shifts to the parent to show the termination of parental rights would be detrimental to the child under one of the four exceptions listed in section 366.26, subdivision (c)(1)(B). (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) An exception to the termination of parental rights exists when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

"The parent must do more than demonstrate 'frequent and loving contact [,]' [citation] an emotional bond with the child, or that parent and child find their visits pleasant. [Citation.] Instead, the parent must show that he or she occupies a 'parental role' in the child's life." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must also show that his or her relationship with the child " 'promotes the well-being of

24

the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*Ibid*., quoting *In re Autumn H*. (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

We review the juvenile court's ruling under the substantial evidence test. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Here, Mother argues her parental rights should not have been terminated given the beneficial nature of her ongoing relationship with G.P. and A.P. The Agency acknowledges that Mother had regular visitations with the boys. Nonetheless, the Agency asserts Mother did not establish that the boys would benefit from continuing their relationship with her. (See *Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-577.) Examining the evidence in the light most favorable to the order, we agree with the Agency.

Yang, who observed Mother during her visits with G.P. and A.P., opined that Mother was more of a friendly visitor than a mother to the boys. In addition, Yang noted that although Mother did exhibit some parenting skills such as feeding the boys, taking them to the restroom, and playing with them, she had not been a parental figure in the boys' lives in two years. Yang also reported that more recently G.P. indicated he no longer wanted to visit with Mother. A.P. expressed similar feelings as well. Further, when Mother asked G.P. to spend the last 10 minutes of a visit with her, he refused. During the last 20 minutes of two subsequent visits, A.P. acted in a similar manner and simply wanted to play by himself. On the way home from a visit in October 2013, A.P. told Yang that he did not want to be touched or talked to.

25

In addition, the record shows that Mother has struggled to overcome her drug addiction. Although she completed a drug treatment program, she rejected the program's recommendation that she participate in aftercare, and she proved incapable of identifying any of the 12 steps of recovery despite her claim that she worked though through the first three steps.

Mother's inability to end her relationship with Michael and break the cycle of domestic violence also supports the court's finding that her ongoing relationship with her children does not promote the well-being of G.P. and A.P. to such a degree as to outweigh the benefit the boys would gain in a permanent home with new, adoptive parents. (See *Autumn H*., *supra*, 27 Cal.App.4th at p. 575.) Mother failed to return to her domestic violence group after attending only one session although she had been involved with at least two domestic violence incidents with Michael, whom she later married. In doing so, she violated the court's order of protection on at least three occasions, resulting in her visitation with G.P. and A.P. reverting back to supervised visits after the Agency had lifted the supervision requirement a short time earlier.

Mother does not address any of the evidence supporting the juvenile court's finding. Instead, she emphasizes that she loves both G.P. and A.P., she interacted well with the boys during her visits while providing for some of their basic needs, and her children like to be with her. Put differently, Mother is not contending that substantial evidence does not support the juvenile court's finding, but instead, she is asking us to reweigh the evidence. This we cannot do. (See *In re S.C.*, *supra*, 138 Cal.App.4th at p. 415.)

26

Moreover, we are not persuaded by Mother's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) and *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M*). Both cases are distinguishable from the instant matter.

In *S.B.*, *supra*, 164 Cal.App.4th 289, we concluded the beneficial relationship exception does not require that a parent establish that a child's primary attachment was to him or her. (*Id*. at p. 299.) Nonetheless, since we issued our opinion in *S.B.*, we have discouraged the improper and inaccurate use of that opinion. (See *In re Jason J.* (2009) 175 Cal.App.4th 922, 937.) Further, we expressly limited the holding of *S.B.*, *supra*, 164 Cal.App.4th 289: "[W]e once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact." (*In re C.F., supra,* 193 Cal.App.4th at pp. 558-559.)

Further, *S.B*, *supra*, 164 Cal.App.4th 289 is factually distinguishable from the instant matter. In *S.B.*, the record included a bonding study by a doctor who described the bond between the father and the child as fairly strong and opined that there was potential for harm if the child lost her parental bond with the father. (*Id*. at pp. 295-296.) Here, the record is devoid of any evidence from a mental health provider, social worker, or bonding expert that terminating parental rights so that G.P. and/or A.P. could be adopted would cause either child emotional or psychological detriment.

Similarly, *Amber M*., *supra*, 103 Cal.App.4th 681 does not bolster Mother's position. In that case, the Court of Appeal concluded the mother had satisfied her burden

27

of establishing the beneficial relationship exception.  (*Id.* at p. 689.)  In reaching this conclusion, the court noted the "common theme running through the evidence from the bonding study psychologist, the therapists, and the CASA [Court Appointed Special Advocate] is a beneficial parental relationship that clearly outweighs the benefit of adoption."  (*Id.* at p. 690.)  Here, Mother can point to no analogous evidence.  Absent Mother, there is not a single witness or any evidence of a beneficial parental relationship between Mother and her children.

Accordingly, we conclude substantial evidence supports the juvenile court's finding that the beneficial relationship exception did not apply here.

III

*FATHER'S DUE PROCESS RIGHTS*

" 'It is axiomatic that due process guarantees apply to dependency proceedings.' " (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222, quoting *Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 756; *Santosky v. Kramer* (1982) 455 U.S. 745, 753-754.)  In determining the process that is due, the court evaluates three elements:  the private interests at stake, the government's interest, and the risk the procedures used will lead to an erroneous decision.  (*Mathews v. Eldridge* (1976) 424 U.S. 319, 335; *Dakota H.*, *supra*, 132 Cal.App.4th at pp. 222-223; see also *Santosky*, *supra*, 455 U.S. at pp. 753-757.)

The California dependency system comports with federal due process requirements because "[t]he number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective

28

certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256.)

While California's dependency scheme no longer uses the term "parental unfitness," and instead requires a finding that awarding custody of a dependent child to a parent would be detrimental to the child, due process requires that the finding of detriment be made by clear and convincing evidence before parental rights may be terminated. (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1210-1211.)

Here, Father contends the juvenile court's determination that G.P. and A.P. are adoptable violated his due process rights because the court never made a finding the children would suffer a detriment if returned to Father. The Agency maintains that Father invited the error. In response, Father contends that "[w]here the fundamental right of parenting is involved, the doctrine of 'invited error' has no application." However, Father does not provide any authority for this proposition. And although we do not discount the importance of a presumed parent's due process rights in the removal of his or her child from the parent's custody, we are not aware of any authority that would provide an absolute safeguard against the invited error doctrine in this context. As such, we analyze the Agency's claim that Father invited the error he now claims on appeal.

"Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [" 'Where a party by his conduct

induces the commission of error, he is estopped from asserting it as a ground for reversal' on appeal."].)

At the April 25, 2013 hearing in this matter, the following exchange occurred:

"[Agency's Counsel]: Can we also have a finding – we never removed custody from the father and we're going to be at a [section 366.26] hearing.

"[Father's Counsel]: Your Honor, he doesn't have custody of the children, so it wouldn't be appropriate.

"The Court: He doesn't have custody of the children. [¶] Okay. All right. So July 31st.

"[Minors' counsel]: Thank you, Your Honor.

"[The Court]: Anything else? [¶] One second, everybody. Hold on.

"[Agency's Counsel]: I think there's a recent case that said that if we don't remove custody, we have to make a detriment finding as to the father regarding the placement – if he wanted placement.

"[The Court]: Right. [¶] I think we're beyond that.

"[Agency's Counsel]: This case was at a [section 366.26 hearing] and the Court never made a detriment finding to remove from the father. [¶] I would be asking at the next hearing that the Court look at the detriment –

"The Court: Bring that case and we'll look at it.

"[Agency's Counsel]: Okay. [¶] Maybe we can ask. [¶] Is he requesting, at this time, custody?

"[Father's Counsel]: Your Honor, since the Court has already removed custody from both parents and ordered a placement, I don't think that removing custody from the father is appropriate, given that he never had custody to begin with and the Court has already made orders on where the children should be placed. [¶] I need to look further into whether or not there is any kind of noticing or search

30

effort issues. [¶] If it then becomes my motion to bring this back to disposition, it's something we could later discuss.

"[Agency's Counsel]: Okay. Because originally she said that we had removed custody from both mother and father.

"[Father's Counsel]: No. No. No. [¶] We had never removed custody from the father, according to the minute orders.

"[Agency's Counsel]: But is the father requesting that the Court consider him as a placement? [¶] If he is, we may need to make a detriment finding as to the father.

"[Father's Counsel]: Father's only request at this point is that he has relatives evaluated.

"The Court: So he's not requesting custody?

"[Father's Counsel]: (No audible response.)

"[Agency's Counsel]: Okay.

"The Court: Okay.

"[Minors' Counsel]: Thank you, Your Honor.

"The Court: Okay. Thank you."

The Agency maintains that Father's counsel misled the juvenile court by arguing a detriment finding as to Father was not appropriate. In doing so, the Agency contends Father invited the error of which he now complains. In contrast, Father argues he did not mislead the court, but, instead, the exchange shows there existed some confusion regarding whether a detriment finding was necessary. Father also insists that the Agency had "ample opportunity to dispute" Father's position. Thus, Father asserts that we cannot find invited error here because: (1) the record is ambiguous regarding whether Father's counsel requested the court refrain from any finding of detriment; and (2) the Agency did

31

not effectively or forcefully argue against Father's position. We reject both these contentions.

Although the exchange between the juvenile court and counsel at the April 25 hearing was somewhat muddled, we are able to draw a few conclusions. The Agency argued at least twice that a finding of detriment was needed. Father's counsel clearly asserted that a finding of detriment was not appropriate because Father never had custody and was not asking for custody of the boys. In addition, Father's counsel represented to the juvenile court that a detriment finding might be something she would raise later depending on what her investigation of the case uncovered. In light of this record, we are satisfied that Father's counsel made a tactical decision to forgo a detriment finding pending her investigation of the case. And, although she later represented Father at the section 366.26 hearing, she decided not to demand a detriment finding at that hearing.

In addition, there is no rule requiring the Agency to have argued against Father's position before it can invoke the invited error doctrine. Further, even if we were to adopt this rule, it would not save Father's argument. The Agency did disagree with Father, but the court ultimately agreed with Father's counsel and did not make a detriment finding.

On the record before us, we conclude Father invited the error of which he now complains and cannot raise the issue on appeal. (See *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.)

Further, even if we were to find that Father did not invite the error of which he now appeals, we nevertheless would conclude Father's contention lacks merit. A finding of detriment may be implied. (See *In re A.S.* (2009) 180 Cal.App.4th 351, 363; *In re*

*P.A.*, *supra*, 155 Cal.App.4th at pp. 1210-1212; see also *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83-84 [implied finding appropriate where substantial evidence supports it].)  Here, the record shows Father has never had a relationship with G.P. or A.P.  His most recent contact with either child was in May 2008, when both he and Mother were arrested and charged with possession of a controlled substance and violation of probation. The Agency took G.P. into protective custody when police found drugs and paraphernalia accessible to him and determined Father could not protect G.P. or provide for his support. Father currently is in prison in Indiana and will not be released until 2019.  In addition, there is evidence in the record that Father will be deported upon his release.

Despite this evidence, Father contends that an incarcerated parent cannot be stripped of his parental rights simply due to the fact of his incarceration.  Generally, we agree with this proposition, but note that none of the cases Father cites compel a different conclusion than the one we reach here.  (See *Maggie S. v. Superior Court* (2013) 220 Cal.App.4th 662, 672; *In re S.D.* (2002) 99 Cal.App.4th 1068, 1077; *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1407.)  These cases are distinguishable from the instant matter because in all three cases, the subject parent either was incarcerated near his or her child and was requesting reasonable reunification services or had arranged for a caregiver to care for his or her children while the parent was incarcerated.  Here, Father asked the juvenile court to place the children with his sister and mother, but they could not care for the boys.  Father argues this fact should not be used to find detriment because his relatives could have cared for G.P. and A.P. when they were removed from their mother's care some two years ago.  However, this argument is mere conjecture.  Instead, we are

33

concerned with whether Father can arrange care for his children now. There is no indication in the record that he can. Further, he is not requesting any reunification services. In other words, our opinion here is not creating the "go to jail, lose your child" rule as Father claims. (See *In re Brittany*, *supra*, 17 Cal.App.4th at p. 1407.)

In summary, we determine there is no merit to Father's claim that his due process rights were violated. Although the Agency raised the issue of a detriment finding as to Father, Father's counsel persuaded the court that one was not necessary. In addition, the record supports an implied finding of detriment as G.P. was removed from Father's custody in 2008; Father will be in prison until 2019; he stated he will most likely be deported upon his release; and Father cannot arrange for any of his relatives to care for G.P. and A.P. Lost in Father's arguments here is any semblance of care or concern for the well being of his boys. "The reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it." (*In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038.) Here, Father has not been part of either of his boys' lives since 2008. He has not expressed any desire to become an active part of his children's lives, and clearly, he is not in a position to accept custody of them. "Childhood does not wait for the parent to become adequate." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310.) Here, there is no indication that Father was ever an adequate parent or has any desire to become one. His children deserve better and the juvenile court's order finding G.P. and A.P. adoptable is an important step toward the permanency and stability they need.

34

It would be nonsensical to send this case back to the juvenile court to make an explicit finding of detriment when Father's counsel discouraged the court from doing so in the first instance and the record supports an implied finding of detriment.

## DISPOSITION

The order is affirmed.

                                                        HUFFMAN, Acting P. J.

WE CONCUR:


            NARES, J.


            AARON, J.

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE


In re G.P. et al., Persons Coming Under the Juvenile Court Law.
_____

S.D. COUNTY HEALTH & HUMAN SERVICES AGENCY,
Plaintiff and Respondent,
v.
Y.Z. et al.,
Defendants and Appellants.
**D064965**
**San Diego County No. J514402**
**San Diego County No. J514402B-C**

THE COURT:

      The opinion in this case filed June 19, 2014 was not certified for publication.  It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), respondent San Diego County Health and Human Resources request pursuant to California Rules of Court, rule 8.1110(a), for partial publication is GRANTED.  The opinion, with the exception of Parts I and II, shall be published.

      IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

      ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be certified for partial publication, with the exception of Parts I and II, in the Official Reports.


              /s/ Huffman_____
                      Acting Presiding Justice


cc:  All Parties