Filed 4/11/22  In re C.B. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re C.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY, | A162229, A162585 |
| Plaintiff and Respondent, | |
| v. | (San Francisco City & County Super. Ct. Nos. JD203044, JD203045) |
| NEIL B. et al., | |
| Defendants and Appellants. | |

In his appeal from the juvenile court's jurisdictional and dispositional orders, Neil B. (father) raises several claims of error.  We affirm.[1]

### BACKGROUND

C.B. (child) was born in September 2019.  Three months later, the child "was hospitalized because he was under weight and . . . was having seizures." In early February 2020, the San Francisco Human Services Agency (Agency) filed a petition alleging the child came within Welfare and Institutions Code

---

[1] C.C. (mother) has also appealed from these orders, but she joins father's briefing and does not raise any appellate issues of her own.  We mention only those facts necessary to address the issues raised by father.

section 300, subdivision (b) (undesignated statutory references are to this code) because he had been diagnosed with "failure to thrive due to insufficient nutrition," and mother had missed the child's medical appointments and declined assistance from a public health nurse. The petition further alleged mother's mental health issues impaired her ability to care for the child and that her home presented a safety hazard. Finally, the petition averred father — the child's alleged father — failed to meet the child's medical needs as he did not "intervene or act protectively" after a medical social worker told him about "the concerns for the [child's] care."

According to the detention report, father acknowledged the Agency made him "aware of the concerns for [the child's] care." He also told the Agency he had seen the child only "a few times since he was born." Father expressed a desire to "be of more support moving forward," but also "wanted to give . . . mother a chance to parent." Father declined the Agency's suggestion to seek custodial rights in family court; he did "not want to be involved with the court system." The Agency referred mother's relatives for placement and worked to attain approvals to place the child with those relatives.

Father did not attend the February 2020 detention hearing, despite receiving notice of it. His mother (grandmother) attended the hearing, as did mother and her relatives. At the hearing, the juvenile court detained the child and placed him in foster care. The court deemed father's nonappearance "willful" and declined to award him visitation. It held a second hearing in late February to give father an opportunity to appear, but father did not do so. The court scheduled a settlement hearing for April 2020 and a combined hearing on jurisdiction and disposition for May; the court

mailed father written notice of both hearing dates and a copy of the dependency petition.

At the April 2020 hearing, the juvenile court appointed counsel for father. Thereafter, father completed a voluntary declaration of paternity. On May 6, 2020 — the date scheduled for the jurisdiction and disposition hearing — the parties jointly agreed to continue the matter to August. The court continued the matter; it also elevated father's status to presumed father and ordered supervised visitation.

When the parties appeared for the August 2020 hearing on jurisdiction and disposition, counsel for mother requested a continuance. Father's counsel had "[n]o objection." The juvenile court continued the hearing to December 7, 2020, the first available court date. But when the parties appeared in December, mother's counsel requested another continuance as she had not been able to discuss the case "in depth" with her client. The other parties expressed concerns about the delay but did not object. The court continued the hearing to January 2021.

In various reports, the Agency noted father suffered from mental health issues as a child. He began smoking marijuana at age 12 and drinking at age 17. As an adult, father drank alcohol "excessively" to the point where it interfered with "his daily routines." Father, however, told the Agency he had stopped "drinking excessively." He was on probation in Yuba County for a domestic violence conviction and had "pending charges" in Yolo County. Father lived with grandmother; he was her "In Home Care Provider." Father had found employment.

The Agency recommended father participate in individual therapy, undergo a substance abuse assessment, complete four consecutive negative drug tests, attend parenting classes, and obtain stable housing. The Agency

3

provided father with the relevant referrals and reminded him to visit the child consistently and "engage in his services." Father's visitation with the child was conducted virtually due to the COVID-19 pandemic. Father did not visit the child consistently and, during one virtual visit, the Agency reported that he appeared to be "taking shots" of alcohol. Father had two brief virtual visits in June 2020, but he often asked to delay visits and "would go for weeks without responding to the [Agency's] phone calls." He missed four of six virtual visits in September, and he did not attend any virtual visits in December. When in-person visitation was offered, father attended those visits more consistently. The child had lived in the same foster home since February 2020 and was "doing well" there.

The juvenile court held a combined hearing on jurisdiction and disposition over two days in early 2021. On the first day of the hearing in January 2021, a social worker testified father was informed of the child's failure-to-thrive diagnosis in February 2020. Another social worker described father's progress on his case plan: father was working, but he was not drug testing and had not begun his year-long domestic violence class, both of which were conditions of his probation. The social worker explained that it was essential for the child, who was 15 months old, to have a "safe and sober adult present to meet his needs" and — given the child's previous medical issues — to "follow the instructions of any medical provider." At the conclusion of that day's hearing, counsel for father asked the Agency to assess "father's home and . . . grandmother" for placement. In response, the Agency stated it had "put in a referral" for grandmother to be assessed. The juvenile court continued the hearing to March.

In an addendum report filed before the second day of the hearing, the Agency noted it had begun the "Resource Family Approval" (RFA) process for

grandmother, but in order for grandmother to be approved for placement, father would need to move out of the house as he was not on the lease. The Agency also reported that father had missed three consecutive visits spanning January and February 2021 and had not begun drug testing or attending domestic violence classes. Nor had father followed up with a therapy referral provided by the Agency.

On the second day of the hearing in March 2021, a social worker testified father was still out of compliance with aspects of his case plan and only recently had begun taking parenting classes to help him "understand the seriousness of what happened to [the child] and how to provide" him with appropriate nutrition "so that he doesn't have any further health issues." The social worker reported the Agency had made the RFA referral, and that grandmother had recently completed the assessment paperwork; her home needed to be assessed by the RFA unit.

Father testified he was not part of the child's life before the dependency was initiated. Father denied having a February 2020 conversation with a social worker about the child's failure-to-thrive diagnosis: he thought the social worker contacted him to ensure mother took the child to doctor's appointments. He did not learn about the child's diagnosis until months later, in May. Father was engaging in services, but he had not begun drug testing because he smoked marijuana. He enjoyed in-person visits with the child but acknowledged missing several virtual visits.

Father asked for grandmother to be assessed for placement "a year and some change ago." In January 2021, the assessment "was brought up" and the social worker made the RFA referral. Father knew grandmother was ineligible for placement while he lived with her; father moved out of

5

grandmother's home approximately five days before the second day of the hearing and was "staying with a girlfriend" on a temporary basis.

Counsel for father urged the juvenile court to place the child with grandmother — according to counsel, father had "been asking for [grandmother] to be assessed for over a year." Counsel argued grandmother's residence qualified as an emergency relative placement. In response, the Agency's counsel asserted grandmother's home had not passed the "buildings and grounds assessment" because father was residing in the home.

The juvenile court sustained the allegations of the petition, including the allegation that father failed to meet the child's medical needs (§ 300, subd. (b)). It declared the child a dependent and found clear and convincing evidence there was a substantial danger to the child's safety, protection, or physical or emotional well-being if the child were returned home, and that there were no reasonable means by which the child's safety, protection, or well-being could be protected without removing the child from parental custody. The court found reasonable services had been offered to prevent or eliminate the removal of the child from the home.

The juvenile court ordered the child to remain in his foster care placement, finding the placement was "necessary and appropriate." It declined "to revisit the emergency placement possibilities." As the court explained, there was an "opportunity for placement" and the Agency investigated "what the placement should be." The court, however, urged the Agency to make "every effort" to investigate father and grandmother for placement. The court scheduled a review hearing for August 2021.

## DISCUSSION

Father raises six claims on appeal. None are persuasive.

6

First, father argues the juvenile court erred by failing to conduct a proper parentage inquiry at the detention hearing. Section 316.2, subdivision (a) "requires the court to inquire as to the identity of all . . . alleged fathers, at the detention hearing or as soon after as practicable." (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.) When an alleged father has been identified, section 316.2, subdivision (b) requires the juvenile court to provide the alleged father with "notice . . . by certified mail return receipt requested alleging that he is or could be the father of the child. The notice shall state that the child is the subject of proceedings under Section 300 and that the proceedings could result in the termination of parental rights and adoption of the child. Judicial Council form Paternity–Waiver of Rights (JV-505) shall be included with the notice." Form JV-505 contains an advisement to alleged fathers regarding reunification, the right to a trial to determine paternity, and the right to be represented by counsel. (*In re Kobe A.*, at pp. 1121–1122.)

The dependency petition identified father as an alleged father, but the juvenile court did not conduct a parentage inquiry at the February 2020 detention hearing. The court did not serve father with the written notice required by section 316.2 until after that hearing, and the notice did not include form JV-505. The Agency concedes these errors led to a delay in elevating father to presumed father status, but argues reversal is not required. (*In re Kobe A.*, *supra*, 146 Cal.App.4th at p. 1122.) We agree. The court appointed counsel for father in mid-April 2020; in early May, the court declared father the child's presumed father — and offered him reunification services — all well in advance of the jurisdiction and disposition hearing. On this record, father has not established the outcome of that hearing would have been different had the court deemed him a presumed father slightly

7

earlier in the proceedings. (*In re Kobe A.*, at pp. 1124–1125; *In re Marcos G.* (2010) 182 Cal.App.4th 369, 388.)

*In re Paul H.* (2003) 111 Cal.App.4th 753 does not assist father. There, the alleged father diligently tried to establish presumed father status, but he was frustrated at every turn by the child welfare agency and the juvenile court. (*Id.* at pp. 756–758.) The alleged father did not receive form JV-505 or statutory notice parental rights may be terminated as required by section 316.2. (*In re Paul H.*, at p. 761.) The appellate court concluded these errors were prejudicial because the alleged father received no reunification services before parental rights were terminated. (*Id.* at p.762.) Here, father made no comparable effort to attain presumed father status: he declined the Agency's invitation to seek custodial rights in family court, and he did not appear at the detention hearing — despite having notice — nor seek to excuse his appearance. And unlike the alleged father in *Paul H.*, father received several months of reunification services before the juvenile court made its jurisdictional and dispositional findings.

Father's next argument is the delay in holding the hearing on jurisdiction and disposition violated his right "to a timely hearing." This claim is forfeited. Although the hearing did not occur within the statutory timeframe (§§ 334, 358), father's counsel did not raise this argument in the lower court, and counsel did not object when the hearing was continued twice at the request of mother's counsel.[2] (*In re T.G.* (2013) 215 Cal.App.4th 1, 14;

---

[2] Having reached this result, we need not consider whether the COVID-19 pandemic constitutes an exceptional circumstance that justified holding the dispositional hearing more than six months after the child was taken into protective custody (see Cal. Rules of Court, emergency rule 6(c)(6)(A)), nor whether father benefitted from the delay in holding the hearing. (*In re Angelique C.* (2003) 113 Cal.App.4th 509, 523 [delayed hearing gave

8

*In re Richard H.* (1991) 234 Cal.App.3d 1351, 1362 [party who failed to object to continuances of adjudication and disposition hearings waived right to claim harm from the delay]; § 352, subd. (c) [absence of an objection from party represented by counsel "shall be deemed a consent to the continuance" of the hearing beyond statutory time period].)  And given that the hearing was continued for several months at the request of all parties — including father — he cannot be heard to complain about the delay on appeal.  (*In re G.P.* (2014) 227 Cal.App.4th 1180, 1196 [party who "invited the error of which he now complains" could not "raise the issue on appeal"].)

Third, father challenges the sufficiency of the evidence supporting the juvenile court's jurisdictional finding that he failed to provide for the child's medical needs (§ 300, subd. (b)).  We decline to consider this claim.  "It is commonly said that the juvenile court takes jurisdiction over children, not parents."  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.)  "As a result of this focus on the child, it is necessary only for the court to find that one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child.  [Citations.]  Once the child is found to be endangered in the manner described by one of the subdivisions of section 300[,] . . . the child comes within the court's jurisdiction, even if the child was not in the physical custody of one or both parents at the time the jurisdictional events occurred."  (*Ibid.*)  For this reason, "a jurisdictional finding involving one parent is ' "good against both." ' "  (*Id.* at p. 1492.)

Thus, the general rule is "an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence."  (*In re I.A., supra,*

---

appellant more time to participate in services], disapproved on another point as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

201 Cal.App.4th at p. 1492; *In re Briana V.* (2015) 236 Cal.App.4th 297, 308.) We take that approach here, as the juvenile court found jurisdiction based on the conduct of both parents, and father does not challenge the sufficiency of the evidence supporting the assumption of jurisdiction based on mother's conduct. (*In re J.C.* (2014) 233 Cal.App.4th 1, 3–4; *In re I.A.*, at p. 1493.) We decline to exercise our discretion to reach the merits of father's jurisdictional challenge. (See *In re J.C.*, at p. 4; *In re I.A.*, at pp. 1393–1394; cf. *In re Drake M.* (2012) 211 Cal.App.4th 754.)

Fourth, father maintains the dispositional order must be reversed because the juvenile court removed the child under the wrong subdivision of section 361 and failed to place the child with him pursuant to section 361.2. To place the issues in context, we briefly review the statutory scheme. Section 361, subdivision (c) governs removal from a *custodial* parent. Section 361, subdivision (d) governs removal from a *noncustodial* parent. Both subdivisions permit removal upon a finding by "clear and convincing evidence" that there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the" child for the parent to have physical custody. (§ 361, subds. (c)(1), (d).)

There also must be no reasonable means by which the child's health can be protected without removing the child. (§ 361, subds. (c)(1), (d).) The juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his . . . home" and to "state the facts on which the decision to remove the minor is based." (*Id.*, subd. (e).) We "review an order removing a child from parental custody for substantial evidence viewing the record in the light most favorable to the juvenile court's findings." (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 344.)

10

Section 361.2 governs placement with a noncustodial parent. Subdivision (a) of the statute "provides that, when the juvenile court removes a dependent child from a custodial parent, the court 'shall first determine' whether there is a parent who wants to assume custody who was not residing with the child at the time the events that brought the minor within the provisions of section 300 occurred. If so, the court 'shall place' the child with the parent unless 'it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.' " (*In re Adam H.* (2019) 43 Cal.App.5th 27, 31.) The court must "make a finding, either in writing or on the record, of the basis for its determination." (§ 361.2, subd. (c).) A juvenile court's placement finding is reviewed for substantial evidence. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.)

The Agency concedes the juvenile court made the removal determination under section 361, subdivision (c), rather than subdivision (d), and that the court failed to reference section 361.2 when making the placement order.[3] But a juvenile court's erroneous application of section 361 rather than section 361.2 will not be reversed unless it is reasonably probable a result more favorable to the appealing party would have been reached in the absence of the error. (*In re D'Anthony D.*, *supra*, 230 Cal.App.4th at

---

[3] Section 361, subdivisions (c)(1) and (d) contain similar language. And the findings required by sections 361 and 361.2 are similar. (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 303.) The juvenile court's reference to section 361, subdivision (c) — and its failure to cite section 361.2 — may stem from the fact that the court recited its dispositional findings as to both parents rather than differentiating between the custodial parent (mother) and the noncustodial parent (father). When the court recited its findings, counsel for father did not inquire whether the findings applied to mother or to father. Nor did counsel object that the court was applying an incorrect standard.

p. 303; *In re Anthony Q., supra*, 5 Cal.App.5th at p. 339.) Here, it is not reasonably probable the juvenile court would have issued a different dispositional order had it considered the "detriment" standard under section 361.2, subdivision (a) because the court found by clear and convincing evidence the child's placement with father posed a "substantial danger" to the child. If such a placement with father posed a "substantial danger" to the child, then it was also thereby detrimental to the child's safety, protection, or physical or emotional well-being. (*In re D'Anthony D.*, at p. 303; *In re Anthony Q.*, at pp. 353–357.)

Nor are we persuaded there is insufficient evidence of detriment. In assessing whether placing a child with the noncustodial parent would be detrimental to the child's "safety, protection[,] or physical or emotional well-being," the juvenile court examines "the circumstances of the parent and [the] child." (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1503, 1506.) Those circumstances include the child's relationship with the noncustodial parent; the child's needs and the competency of the noncustodial parent to provide for those needs; how placing the child with the noncustodial parent will affect the child's bonds with his siblings; and the child's wishes. (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1402.) The juvenile court must "weigh all relevant factors to determine if the child will suffer net harm" (*In re Luke M., supra*, 107 Cal.App.4th at p. 1425) and no one circumstance is dispositive. (*In re C.M.*, at p. 1402.)

Here, the child's relationship with father at the time of the hearing was minimal. By his own admission, father had seen the child only a few times before the dependency was initiated, and he visited the child inconsistently during the dependency. The child — who was nearly 18 months old when the hearing was held — had spent the majority of his life in the same foster care

12

placement with his half-sibling. The Agency also offered evidence casting serious doubt on father's ability to adequately care for the child. The social worker testified it was essential for the child to have a "safe and sober adult present to meet his needs" and — given the child's previous medical issues — to "follow the instructions of any medical provider." Father had previously abused alcohol, currently used marijuana, and lacked insight into the extremely serious medical issue that brought the child to the Agency's attention. Additionally, father's housing situation was unstable, and he was out of compliance with probation. Together, this evidence amply supports the juvenile court's dispositional finding, by clear and convincing evidence, that the child would be harmed if he were uprooted from the only stable home he had known and placed with father. (See *In re A.C.* (2020) 54 Cal.App.5th 38, 44; *In re Luke M.*, *supra*, 107 Cal.App.4th at pp. 1425–1427.)

In attacking the sufficiency of the evidence, father urges us to overlook certain facts, or parses the facts and then argues each fact, standing alone, is insufficient to establish detriment. This strategy — which misapprehends the standard of review — is not persuasive. When reviewing the dispositional order for substantial evidence, we do not "resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record in favor of the juvenile court's order and affirm the order even if other evidence supports a contrary finding." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161–1162.) The question is whether the "record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995–996.) Here, the answer is yes.

13

Fifth, father insists the juvenile court failed to offer him reasonable reunification services. A "reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.) Father failed to challenge the adequacy of the reunification services in the lower court. At the jurisdiction and disposition hearing, counsel for father made a passing reference to the Agency's concession that "no reasonable services were offered to . . . father." That brief comment — which mischaracterized the Agency's argument — was not sufficient to put the Agency, or the juvenile court, on notice that father was challenging the adequacy of the services. Instead of doing so, counsel asserted father had engaged with the provided resources. For example, counsel noted father had completed a substance abuse assessment, taken parenting classes, and visited the child. And when the court determined the services were reasonable, counsel for father did not object.

Had father raised concerns about the adequacy of reunification services, the juvenile court might have decided the services were inadequate, or determined additional services were warranted. In other words, the problem " ' "could easily have been corrected" ' " by the juvenile court. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 501.) Allowing father to challenge the adequacy of services on appeal when he was silent on this issue in the juvenile court would be unfair to the juvenile court and the other parties.

14

(*Ibid.*) The argument is forfeited. (*In re Kevin S.* (1996) 41 Cal.App.4th 882, 885–886.)[4]

Father's final argument is the Agency failed to timely assess grandmother, and give her preferential consideration, for placement at the disposition hearing. Section 361.3 provides that when a child is removed from the physical custody of his parents at the disposition hearing, "preferential consideration shall be given to a *request by a relative* of the child for placement of the child with the relative." (§ 361.3, subd. (a), italics added.) " 'Preferential consideration' means that *the relative seeking placement* shall be the first placement to be considered and investigated." (§ 361.3, subd. (c)(1), italics added.) Relevant here, " '[r]elative' means an adult who is related to the child by blood." (*Id.*, subd. (c)(2).) The child welfare agency is required "to assess those *relatives seeking placement*" according to the factors enumerated in section 361.3, subdivision (a) — which include the child's best interest — and must document those efforts in a report. (*In re Isabella G.* (2016) 246 Cal.App.4th 708, 719, italics added.) "The relative placement preference, however, is not a relative placement *guarantee*." (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 798.) We review "the juvenile court's determination regarding relative placement pursuant to section 361.3" for abuse of discretion. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

---

[4] Having so concluded, we need not determine whether a noncustodial parent must be offered reunification services before disposition. Assuming for the sake of argument the answer is yes, substantial evidence supports the juvenile court's conclusion that the provided services were reasonable. (See *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

15

It is axiomatic that the relative placement preference applies when a blood relative requests placement or indicates an interest in such a placement. (See *In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1185.) Reviewing the record in the light most favorable to the juvenile court order, we conclude the evidence supports a reasonable inference that grandmother did not request placement, or express an interest in placement, until the jurisdiction and disposition hearing began in January 2021. (*In re Caden C.* (2021) 11 Cal.5th 614, 640 [juvenile court's factual determinations are reviewed for substantial evidence].) True, grandmother appeared at the detention hearing in February 2020. But at that juncture, grandmother did not qualify as a "relative" under section 361.3 because father's paternity had not been established, and the record demonstrates she did not seek placement at that hearing. When counsel for father requested placement with grandmother during the hearing on jurisdiction and disposition, the Agency began the assessment process. And at the conclusion of that hearing, the court ordered the Agency to complete the assessment expeditiously.

When it made the placement determination, the juvenile court was presented with information that the Agency had attempted to place the child with mother's relatives, and that grandmother did not request placement until the jurisdiction and disposition hearing had begun. Also before the court was evidence that grandmother's home was unsuitable for placement while father lived there, and that child was doing well in foster parents' home, where he had resided for most of his life. On this record, we cannot conclude the court's placement decision was an abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) This case is not like *In re R.T.* (2015) 232 Cal.App.4th 1284, where the child welfare agency ignored the paternal relatives' repeated requests for placement — the first of which

occurred when the minor was just weeks old — and refused to evaluate the relatives for placement.  (*Id.* at pp. 1293, 1297–1299.)

Father's testimony that he asked for grandmother to be assessed for placement in March 2020 does not undermine our conclusion.  At that point, father had not appeared in the case, had not been elevated to presumed father status, and had expressed an unwillingness to be "involved with the [family] court system."  Had father made such a request, the social worker would have been duty bound to include that information in the Agency's report, and to investigate grandmother for placement.  We presume the social worker properly performed her official duty.  (See *People v. Gonzalez* (2021) 12 Cal.5th 367, 394.)  In any event, the juvenile court was not persuaded by father's testimony; on review, we do not reweigh the evidence or overturn the trial court's credibility determinations.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319; *In re Caden C.*, *supra*, 11 Cal.5th at p. 640.)

We also conclude the juvenile court's failure to articulate a more precise statement of reasons for declining to place the child with grandmother is harmless (§ 361.3, subd. (e)) "[b]ecause the reasons for denying placement are clear from the evidence and discussion at the hearing and support the court's decision."  (*In re Joseph T.*, *supra*, 163 Cal.App.4th at p. 798.)  Father's other claims have been considered and merit no further discussion, including father's argument that the Agency failed to include "required information" about grandmother in its reports, and that the Agency failed to place the child with grandmother "as an emergency placement."

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

_____

Rodríguez, J.

WE CONCUR:

_____

Fujisaki, Acting P. J.

_____

Petrou, J.

A162229 & A162585