Filed 11/8/23  In re D.C. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.C. et al., Persons Coming Under Juvenile Court Law. | B320043 c/w B323476 |
| _____ | (Los Angeles County Super. Ct. No. 22CCJP00301A-C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| L.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Charles Q. Clay III, Judge.  Affirmed.

Elizabeth Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

## *INTRODUCTION*

L.G. (mother) appeals the juvenile court's order exerting dependency jurisdiction over her three children, the related dispositional order, and the order at the six-month review hearing continuing the placement of mother's two youngest children outside mother's care. None of mother's arguments has merit, so we affirm.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### 1. *Mother and Father's History of Domestic Violence, Mother's Alcohol Consumption, and Impact on Children*

Mother has four children, D.C. (born 2010), T.C. (born 2018), A.C. (born 2020), and an adult daughter who is not the subject of this appeal. D.C's father is C.C. A.C and T.C's father is Aaron C. (father). Neither father lived with mother at any time relevant to the appeal. Father and mother have a history of domestic violence. In March 2019, father started a physical fight with mother that caused T.C. to fall out of mother's arms onto the floor, prompting mother to take the infant to the hospital. On December 9, 2021, father "dragged [mother] all over the street and bit [her] nose." D.C. reported that the domestic violence between father and mother occurs "all over the street" outside the home, and that the then 11-year-old witnessed the violence from the window of their apartment. D.C. stated she had seen mother and father push each other, and her adult sister hit father with a broom after father hit mother. D.C. also reported that mother drank alcohol "almost every time [mother and father] get into an argument."

Mother's neighbor reported that mother is "always drinking with [father] in the car or possibly in the home," and she often

2

leaves the children home with their adult sister. The adult daughter who lives with mother — D.C.'s older sister — reported that mother and father engage in domestic violence outside the home and that mother drinks alcohol outside the home and returns home drunk.

On December 17, 2021, father "broke into [mother's] house" and took T.C. from the home while mother was at her grandfather's birthday celebration. The same day, the Department of Children and Family Services (Department) received a referral alleging mother is an alcoholic who leaves her children home alone.

When father spoke with the Department on December 28, 2021, he reported that mother provides excellent care for the children. About one week later, father rescinded his prior statement, explaining that he had not previously been able to speak freely because mother was there. He reported that he was in fact concerned because mother is "an alcoholic," "leaves the house for days at a time," and "doesn't clean."

C.C., D.C.'s father, also reported concerns about mother because of her history of alcohol abuse. He reported that when D.C. visits him, she worries and wants to return home to help with her siblings. D.C. was reluctant to share with her father what went on in mother's home, and sometimes cried when she did tell him. D.C. shared that knives were brought out during one physical altercation between father and mother. C.C. stated that he took D.C. to see a doctor in June 2021 after learning she had not been seen by a doctor in six years. He brought her for a second appointment a couple months later for her eczema flare-up. Although C.C. gave mother the doctor's prescription for D.C., mother never picked up the medication.

D.C. was "absent a lot" from school. After D.C. had not been at school for several days, the school tried to contact mother on October 3, 2021, but could not reach her. D.C. returned to school on October 3 with no note or explanation.

Mother's criminal history includes a DUI in 2010 and disorderly conduct, intoxication, and carrying a loaded firearm in April 2021. Father has an extensive criminal history, including trespassing, battery, domestic violence, kidnapping, and possession of a firearm.

## 2. *Removal and Filing of Petition*

On January 24, 2022, the Department filed a petition under Welfare and Institutions Code section 300, alleging under subdivisions (a) and (b) that mother and father have a history of engaging in violent physical altercations, including in D.C.'s presence, which places the children at risk of serious physical harm, damage, and danger, and under subdivision (b) that mother has a history of substance abuse and is a current abuser of alcohol rendering her incapable of caring for the children.[1]

At the January 27, 2022, detention hearings, the juvenile court removed D.C., A.C., and T.C. from mother and placed them with their respective fathers. The court also ordered weekly drug and alcohol testing for mother, and granted mother two, two-hour monitored visits per week. After three consecutive clean tests, mother's visits would become unmonitored, provided she continued to test clean.

---

[1] All future statutory references are to the Welfare and Institutions Code.

4

### 3. *Mother Moves in with Maternal Grandmother*

On February 2, 2022, mother reported that she would be moving in with maternal grandmother and staying for a month or two. On February 4, 2022, the Department assessed maternal grandmother's home. The living room had 10–15 medium boxes in the corner. There was a bedroom, but it contained so many items that the door could not be opened, and the Department could not enter the bedroom to assess it. There was an unassembled toddler bed in the apartment, which mother reported T.C. and A.C. would share if they were returned to her. Mother told the Department that she would assemble the bed that evening, and the Department asked her to send a photo of the bed once she did. The Department never received a photo.

### 4. *T.C. and A.C. Are Removed from Their Father*

On February 9, 2022, the Department received a referral alleging that, although T.C. and A.C. had been placed with father, father was homeless. Father had told the court he lived with the reporting party in Las Vegas, NV. The reporting party "was concerned because father was drinking alcohol excessively," and "would leave the children unattended while falling asleep." "Father was told he had to leave the home and then he began making threats of harm . . . ." He then stumbled and knocked T.C. over, took A.C. and T.C. and put them in his car, broke car windows, stabbed car tires, and drove off before the police arrived.[2]

The next day, father brought T.C. and A.C. to the Department for placement and stated he was unable to care for them.

---

[2]    It is unclear from the record whether father vandalized his own car or another person's car.

On February 17, 2022, the juvenile court granted the Department's ex parte application to remove A.C. and T.C. from father and have them suitably placed.

**5.**     *Jurisdictional and Dispositional Report*

The Department interviewed then 12-year-old D.C. in early February 2022. She reported that mother and father argue and engage in physical fights, but not inside the apartment. When asked whether she had seen father dragging mother down the street or hitting mother, she responded "no." D.C. reported that mother "kind of" has "a problem with alcohol," but that "she does not do it every day." She also explained that mother drinks alcohol "sometimes in the afternoon; sometimes at night," and that she "does not act different" when she drinks, but "would get kind of tired."

The Department also interviewed mother in early February 2022, and she reported that domestic violence between father and her "happen[s] way too often and [she is] not the abuser," and just tries to defend herself. Mother reported that father "is violent and that he has a problem with drinking" and "becomes violent" when intoxicated. Despite the violence, mother stated she had "always tried to allow [father] to be a part of the children's lives," and that "she thought she was doing the right thing" by allowing father to see them. When asked why mother did not obtain a restraining order following the 2019 incident in which father hit mother, and infant T.C. fell to the ground, mother replied that although "she initially obtained a temporary restraining order," she "did not realize how it worked and never pursued it." The Department asked about the most recent restraining order mother had obtained against father, and mother "reported that she obtained a temporary restraining order, but did not get a

6

permanent one, because she was unaware of how they worked." Mother reported never having been to a domestic violence shelter; she explained that "usually, she just moves to a different location, but eventually she tells the fathers where she is residing." Mother also explained that her DUI from 2010 "was not abuse of alcohol," but rather she had only had "a little bit of wine and was moving [her] car." Regarding her 2021 arrest for disorderly conduct and public intoxication, mother explained that she "was not intoxicated," but that the police said that she was "just because [she] had an outburst." Mother said that father "is a trigger for her to drink," but reported "that she does not have a problem with alcohol and only would drink occasionally." Mother also explained that when she drinks alcohol, "the children are usually in the bed and they are usually already fed, bathed and asleep."

When the Department interviewed father, he reported that mother drank alcohol "throughout her pregnancy," and "that mother's drinking has become worse in the past six months." Father stated that mother "went to jail in . . . April of 2021 because she had a gun and she was drunk in the streets."

**6.** *Jurisdictional Hearing*

The jurisdictional hearing took place on February 25, 2022. The Department reached a settlement with father, under which the subdivision (b) count would be sustained against father as amended to omit details about the December 9, 2021, domestic violence incident. The subdivision (a) count would be dismissed. The juvenile court sustained both counts against mother under subdivision (b).

### 7. *Dispositional Hearing*

At the March 7, 2022, dispositional hearing, the juvenile court ordered D.C., T.C., and A.C. removed from mother—D.C. placed with C.C., and T.C. and A.C. suitably placed with the Department. The court granted mother unmonitored visits and ordered her to undergo a full drug and alcohol treatment program, submit to weekly drug testing, participate in a 12-step program, and complete a parenting course and domestic violence program for victims.

### 8. *Notice of Appeal*

On April 19, 2022, mother filed a timely notice of appeal from the jurisdictional findings and disposition order.

### 9. *Six-month Review Period*

Mother attended AA, a substance abuse program, domestic violence classes, and parenting classes. Mother's substance abuse counselor reported on August 5, 2022, that mother "ha[d] made some progress," but that "it[ had] been up and down." Mother "tested positive [for alcohol] a few times," including once in June and once in July. Mother reported learning from the AA program that "alcoholism is a disease that can be maintained," and from the domestic violence classes the "red flags of unhealthy relationships" and the importance of "set[ting] boundaries." She also reported that "now [she] need[ed] to apologize to [her] children for being in an abusive relationship." Mother's AA sponsor reported that mother's classes are "helping her," that mother "will be ok," and that she "is doing a lot better now that [father] is in jail and he's not around."[3] Between January 2022 and July 2022, mother tested negative on all of her random

---

[3] Father was arrested on May 6, 2022.

8

weekly drug and alcohol tests, except for three days on which she was a "no show."

**10.** *Section 364/Six-month Review Hearing*

On September 9, 2022, the juvenile court heard mother's section 364 petition for the return of her children and also conducted the six-month review hearing. The court awarded mother and C.C. joint legal and physical custody of D.C., terminated jurisdiction over D.C., but stayed the termination pending the issuance of the juvenile custody order.

As to T.C. and A.C., the court found that mother's progress with her case plan had been "substantial," continued jurisdiction and reunification services, and kept the order of suitable placement in place, finding "by clear and convincing evidence that return of [T.C. and A.C.] to the physical custody of [mother] would create a substantial risk of detriment to the child[ren], creating a continued necessity for appropriateness of the current placement."

**11.** *Notices of Appeal*

Mother filed her second notice of appeal on September 7, 2022—this one from the orders made at the six-month review hearing. Two days later, the juvenile court entered the formal custody order and terminated jurisdiction as to D.C. Mother timely filed an amended notice of appeal on September 14, 2022. Upon mother's request, we consolidated her appeal from the juvenile court's jurisdictional findings with her appeal from the finding at the six-month review hearing that it would be detrimental to return A.C. and T.C. to her custody.

***DISCUSSION***

**1.    *Justiciability***

As a threshold matter, the Department asserts that mother's challenge to the jurisdictional findings is moot because father did not challenge the jurisdictional findings related to his conduct.  We disagree.  Where, as here, "a jurisdictional finding 'serves as the basis for dispositional orders that are also challenged on appeal' [citation], the appeal is not moot." (*In re D.P.* (2023) 14 Cal.5th 266, 283.)  The Department is correct that "[t]he problem that the juvenile court seeks to address [in its dispositional order] need not be described in the sustained section 300 petition." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311 [rejecting a father's challenge to an order requiring him to attend sexual abuse counseling].)  But that observation is irrelevant here, where the juvenile court's jurisdictional findings plainly formed the basis for its dispositional order insofar as it removed the children from mother and ordered mother to attend a drug and alcohol treatment program, submit to weekly drug testing, participate in a 12-step program, and complete a domestic violence program for victims.  Those findings were also the basis of the court's denial of mother's section 364 petition in which she asked that two of her children be returned to her.  Accordingly, we address mother's challenge to the jurisdictional findings on the merits.

**2.    *The Jurisdictional Findings Were Supported by Substantial Evidence***

Mother asserts that the petition must be dismissed "in its entirety" as to her because "there was no defined risk of harm to all three children."

10

A juvenile court may exert jurisdiction over a child under section 300, subdivision (b)(1), if it finds by a preponderance of the evidence that " '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child,' " the willful or negligent failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment, or the inability of the parent to provide regular care for the minor due to the parent's mental illness, developmental disability or substance abuse.' " (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561.)

"The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing " ' "subject the minor to the defined risk of harm." ' " (*In re L.B.* (2023) 88 Cal.App.5th 402, 411 (*L.B.*); *In re T.V.* (2013) 217 Cal.App.4th 126, 133.) "To establish a defined risk of harm at the time of the hearing, there 'must be some reason beyond mere speculation to believe the alleged conduct will recur.' " (*L.B.*, at p. 411, quoting *In re D.L.* (2018) 22 Cal.App.5th 1142, 1146 (*D.L.*); see also *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383 ["the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child"].) "The court may consider past events in deciding whether a child currently needs the court's protection." (*Ibid.*) "[W]e must uphold the court's [jurisdictional] findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings." (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.)

11

There is no dispute that domestic violence occurred between father and mother:  D.C., her adult sister, mother, and father all reported the same.  "[I]n a domestic violence situation, past violence is highly probative of the risk that violence may recur."  (*L.B.*, *supra*, 88 Cal.App.5th at p. 411.)  In 2019, while mother was holding infant T.C., father pushed mother, knocking T.C. to the ground and prompting mother to take T.C. to the hospital.  In December 2021, mother reported that father dragged her through the street and bit her nose.

The court's implied finding of a defined risk of harm was based on even more compelling evidence—including mother's own reports—that "mother and [father] repeatedly *engage* in domestic violence."  (Italics added.)  That is, the instances of domestic violence between father and mother were not merely isolated incidents from the distant past, but were ongoing; mother herself reported—in the weeks preceding the jurisdictional hearing— that the domestic violence "does happen way too often."

Mother urges that there was no defined risk of harm to the children because she "was not in a relationship with [father]" and acknowledged the family needed "to stay away from [father]." But this ignores the evidence—including father's and mother's own reports—that father has issues with "jealousy" and that violence between them had occurred during arguments about them "no longer [being] together."

What is more, mother reported that she did not pursue permanent restraining orders after the 2019 incident in which father hit mother, knocking T.C. to the ground, or after the 2021 incident in which father dragged her on the street and bit her. To the contrary, Mother reported "that in spite of the domestic violence, she has always tried to allow [father] to be part of the

12

children's lives." D.C. told the Department that father and mother get into arguments every two to three weeks. D.C. also disclosed to C.C. that knives were present during one fight between father and mother, and that another time mother's adult daughter hit father with a broom to defend mother after father had hit her. Taken together, this evidence established "reason beyond mere speculation" to believe the domestic violence would recur. (*D.L.*, *supra*, 22 Cal.App.5th at p. 1146.)

The juvenile court's finding that mother's alcohol use posed a defined risk of harm was also supported by substantial evidence: Mother's adult daughter reported that mother would drink outside the home and return home inebriated. Mother's neighbor reported that "mother is always drinking," yelling, and cussing, and that mother often leaves the children home with their adult sister. C.C. reported that mother left D.C. at school one day in January of 2022, and the school reported that D.C. had various unexplained absences. C.C. took D.C. to see a doctor after learning that she had not seen a doctor in six years. Mother's criminal history includes a DUI, disorderly conduct, and carrying a loaded firearm.

When the Department interviewed mother before the jurisdictional hearing, she reported "never [drinking] to the point of being inebriated." Particularly "where the parent denies there is a problem," "[a] court is entitled to infer past conduct will continue." (*In re K.B.* (2021) 59 Cal.App.5th 593, 605; see also *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"]; *In re V.L.* (2020) 54 Cal.App.5th 147, 156.) In support of her argument that there was no defined risk from her alcohol use, mother cites the Department's recommendation of unmonitored visitation for

mother and D.C. and D.C's counsel's request that D.C. be ordered to the home of both C.C. and mother. But neither the Department's recommendation nor counsel's request negates the contrary substantial evidence of risk of harm. Mother also cites her three consecutive negative drug and alcohol tests. Mother essentially asks us to reweigh the evidence which we cannot, and do not, undertake. (*In re Caden C.* (2021) 11 Cal.5th 614, 641.)

Finally, mother asserts that the Department "wrote the children were healthy," and points out that "mother had been the primary caregiver of all three children their entire lives." Again, this assertion does not undermine the substantial evidence that supports the juvenile court's order. Specifically, "the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383.)

3.   ***Mother Has Forfeited Her Argument That the Six-month Review Finding of Detriment Was Not Supported by Substantial Evidence***

Mother argues that the juvenile court's continued removal of T.C. and A.C. from mother's custody at the six-month review hearing was not supported by substantial evidence. The Department responds that mother has waived this argument under the doctrine of invited error. We agree that mother's claim is forfeited.

"Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." (*In re G.P.* (2014) 227 Cal.App.4th 1180, 1193.)

At the six-month review hearing, mother's counsel specifically asked the juvenile court "to grant mother overnight

14

visits at the current caregiver's home in Lancaster," claiming that "she is considering the best interest of the children here in asking that those overnights take place at the caregiver's home so as not to disrupt the children's regular routine and schedule that they have established there."  Mother's counsel added:  "We do think this is an appropriate request at this point, considering mother's progress in her case plan.  We would just ask the Department to have discretion to further liberalize those visits."  The record leaves no room for dispute that the error mother claims on appeal—if an error at all—was one that she invited when she specifically requested that the juvenile court grant her overnight visits at the caretaker's house and did not object to the court's decision not to return custody of the children to her.

In her reply brief, mother suggests that in the absence of her "stipulation" that the children not be returned to her, her objection at the March 7, 2022, hearing "to the court not making a home of parent mother order" extended to the September 6, 2022, six-month review hearing.  She cites no authority for a so-called "standing objection" procedure that continues from hearing to hearing.  Such a rule would make no sense in juvenile proceedings where conditions often change from month to month, and the then-present situation of the parties is critical to the court's orders.  The reporter's transcript from the September 6, 2022, hearing shows that mother had no objection to—and indeed requested that—A.C. and T.C. remain placed with their caretaker with mother having overnight visits in caretaker's home.

15

### *DISPOSITION*

The juvenile court's findings and orders are affirmed.


                                                       RUBIN, P. J.

WE CONCUR:


MOOR, J.


KIM, J.

16