Filed 11/8/23  In re E.M. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re E.M., a Person Coming Under the Juvenile Court Law. | C097308 |
| PLACER COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Super. Ct. No. 53004634) |
| Plaintiff and Respondent, | |
| v. | |
| H.H. et al., | |
| Defendants and Appellants. | |

Appellants H.H. and J.H. (the guardians) were appointed minor E.M.'s guardians as the permanent plan in a dependency action.[1]  After several safety concerns arose in their home, including J.H.'s alcohol abuse, respondent Placer County Department of

---

[1]     H.H.'s request to take judicial notice of the juvenile court's findings and order terminating mother's reunification services, selecting guardianship as the permanent plan for E.M., and awarding guardianship to J.H. and H.H. is granted.

1

Health and Human Resources (Department) filed a Welfare and Institutions Code[2] section 387 petition and a section 388 petition to terminate the guardianship and place E.M. in foster care until a new permanent plan could be selected. At the parties' urging, the juvenile court ruled on the section 388 petition first, finding that it was in E.M.'s best interest to terminate the dependency guardianship. Given its ruling, the juvenile court found that the section 387 petition was moot. The guardians each separately appeal the order terminating the dependency guardianship.

They argue on appeal that the juvenile court should have proceeded under section 387 rather than section 388 to terminate the guardianship and that the error was not harmless. They contend that by ruling on the section 388 petition, the juvenile court deprived them of a disposition hearing, failed to consider the effect of terminating the guardianship on E.M.'s relationship with one of his biological brothers who remained under the guardians' custody and care, and denied them reunification services that would have preserved the guardianship.

We conclude the guardians forfeited their challenge by urging the juvenile court to rule on the section 388 petition before the section 387 petition, and by failing to argue below that the section 388 petition was not an appropriate mechanism to terminate the dependency guardianship under the circumstances. In any event, even if not forfeited, we conclude the juvenile court properly terminated the guardianship under section 388. We therefore affirm.

---

[2] Further undesignated statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Dependency Guardianship of E.M.*

E.M. originally resided with his mother and several siblings, including his older brothers Ar.M. and A.M.[3] His father is deceased.

In May 2017, the Placer County Juvenile Court declared then six-year-old E.M. a dependent under section 300, subdivisions (b) and (c) based on domestic violence and substance abuse issues involving his mother and her boyfriend. The juvenile court terminated his mother's services in November 2018 after she failed to successfully reunify with her children.

E.M. was placed in foster care with J.H. and his wife H.H. in approximately June 2018. In August 2019, the juvenile court selected guardianship as the permanent plan for E.M. under section 366.26 and awarded guardianship of E.M. to the guardians; J.H. and H.H were also awarded guardianship of Ar.M. and A.M. Although A.M.'s dependency case was closed after the letters of guardianship issued, E.M.'s dependency case remained open due to his immigration status.[4]

The guardians worked with a nonprofit agency to submit various immigration paperwork on E.M.'s behalf to change his immigration status to permanent resident status. However, certain items were missing or not timely returned, and the application was later denied. The guardians also failed to return certain educational forms to E.M.'s school so that he could be assessed for an individualized educational plan (IEP) to address some learning disabilities and reading deficits. And although E.M. wore

---

[3]     E.M.'s brothers are not part of this appeal. We discuss facts related to them only for context.

[4]     The record does not contain information on whether Ar.M.'s dependency case remained open. The guardianship of Ar.M. ended after he turned 18; he has since moved out of the guardians' home and back in with his mother.

eyeglasses daily, the guardians did not replace his glasses for several months after he misplaced them.

### B.    *Problems in the Guardians' Home*

In September 2020, the guardians began having marital problems and J.H. started drinking excessively.  They did not initially disclose J.H.'s alcohol abuse to the Department or to Triad Family Services Foster Care and Adoption Agency (Agency), the foster family agency that licensed them as a foster home.

By June 2021, H.H. had confronted J.H. about his alcohol abuse and offered to take him to Alcoholics Anonymous meetings, but he did not go.  During a home visit in September 2021, H.H. finally disclosed to an Agency social worker that J.H. had been abusing alcohol for about six months to a year.  He had recently lost his long-term employment as well as a replacement job because of his drinking.

Over the course of the next several months, the Agency and the Department conducted numerous child and family team (CFT) meetings with one or both of the guardians to address safety concerns regarding J.H.'s alcohol abuse, and the Agency advised the guardians that E.M.'s placement may be in jeopardy if J.H. continued to drink.  The parties agreed to safety plans that included unannounced check-ins and prohibited J.H. from being alone with E.M. without adult supervision, drinking in E.M.'s presence or transporting him anywhere, and required that all alcohol be kept in a locked location.  H.H. agreed to notify social workers if J.H.'s drinking increased or if he appeared intoxicated.

Although the Department and the Agency attempted to help J.H. seek treatment, he did not do so and was eventually asked to move out of the family home in November 2021.  J.H. was arrested for drunk driving in December 2021 and was later convicted of driving under the influence causing bodily injury (Veh. Code, § 23153, subd. (b)) and hit and run resulting in injury or death (Veh. Code, § 20001, subd. (a)) based on the incident.

4

The guardians did not inform the Department or the Agency of J.H.'s arrest or convictions.

During December 2021, H.H.'s relatives visited the family for the holidays. E.M.'s brother, A.M., was subsequently accused of molesting another minor during the visit.

C.      *Section 387 Petition*

In May 2022, the Department filed a section 387 petition to remove then 11-year-old E.M. from the guardians' custody to foster care based on J.H.'s alcohol abuse, which rendered him incapable of properly caring for E.M.[5]  The petition alleged that J.H. had been asked to vacate the family home in November 2021 after a social worker observed him falling down the stairs drunk while E.M. was present.  J.H. also showed up at the family home for a visit in March 2022 after he had been drinking excessively.  H.H. had failed to timely report concerns about J.H.'s drinking and both guardians had failed to provide suitable psychiatric care for A.M. after he was accused of molesting a minor in their home.  The petition noted that based on this conduct, the guardians' foster care license had been revoked.

A detention report discussed the CFT meetings held in November 2021 and January, February, and March 2022, and described the various safety plans the parties had developed to address J.H.'s alcohol abuse, including that H.H. timely notify social workers if J.H.'s drinking increased or if he was intoxicated.  Notwithstanding the notification requirement, the Department had discovered J.H.'s drunk driving arrest and convictions only after conducting a CLETS search while preparing the detention report because neither H.H. nor J.H. had disclosed the criminal conduct.

---

[5]      The Department did not seek to remove A.M. from the guardians' care.

J.H. attended a few Alcoholics Anonymous meetings and spoke with people at his church, but his attempts to stop drinking on his own proved unsuccessful. He admitted drinking in January, March, and May of 2022.

The juvenile court detained E.M. in May 2022 and temporarily placed him in foster care. The court found that continuing E.M. in the guardians' home was contrary to his welfare because there was a substantial danger to his physical and emotional health and no reasonable means to protect his health existed without removing him from the guardians' physical custody. The court also found that reasonable and active efforts had been made to prevent or eliminate the need to remove E.M. but that detention was nevertheless necessary. The guardians, as well as E.M.'s mother, were provided visitation.

D.      *Section 388 Petition to Terminate Guardianship*

In June 2022, the Department filed a section 388 petition to terminate the guardianship based on the same conduct alleged in the section 387 petition. The section 388 petition specifically alleged that it was in E.M.'s best interest to terminate the dependency guardianship given J.H.'s alcohol abuse, the guardians' dishonesty about the extent of J.H.'s alcohol problem, J.H.'s failure to access services to help achieve sobriety, which he had failed to do for any significant period of time (having relapsed as recently as May 2022), the guardians' failure to follow through with E.M.'s immigration application, and their failure to arrange for therapy services for E.M. and A.M. after A.M. was accused of molesting a minor in their home. The petition further noted that the guardians had lost their foster care license based on the above issues.

E.      *Jurisdiction/Detention Report*

A June 2022 combined jurisdiction/disposition report recommended that the juvenile court sustain the section 387 petition and find that the legal guardianship was no longer effective in protecting E.M.; it also urged the court to terminate the legal guardianship, and referred the court to the Department's section 388 petition for

6

modification to terminate the guardianship. The report described how E.M. and A.M. revealed that in November 2021, J.H. drove intoxicated with other foster care or adopted children in his car.

The Department asserted that H.H. also had difficulty meeting E.M.'s needs, including failing to: timely order replacement glasses after he had lost his glasses, finalize his immigration application, and submit necessary information to E.M.'s school to complete an IEP assessment so that he could qualify for special education services. The Department thus recommended that the juvenile court find the guardianship was no longer effective in protecting E.M., and that the court terminate the guardianship.

The report considered whether E.M. should be placed with his mother, but recommended that the mother's circumstances had not changed since termination of services because she was still in a relationship with her boyfriend who perpetrated the domestic violence necessitating E.M.'s removal from her care. The Department also noted that E.M.'s now adult brother, A.M., who was in jail on pending criminal sexual assault charges involving a minor, was supposed to move in with the mother upon his release. The Department recommended against providing the mother with additional reunification services due to her minimal change of circumstances, her seeming lack of insight, and her willingness to place her other children's needs above E.M.'s.

The Department also assessed, pursuant to section 366.3, whether E.M. could safely be returned to the guardians' home without terminating the legal guardianship. The Department concluded that returning E.M. to the guardians' care would be detrimental, that it would not be in his best interest to offer services to attempt to preserve the guardianship, and that the guardianship should be terminated given the guardians' inconsistent care, lack of transparency with the Department, the recent sexual assault allegation against A.M. while in their home, and J.H.'s continued alcohol abuse. The Department had already offered the guardians support for many months prior to detention

and the guardians had failed to take prompt action to address the safety concerns posed by J.H.'s substance abuse problem and other noted issues.

*F. Contested Hearing*

In June 2022, the Department requested a contested hearing on the section 388 petition be set in conjunction with the jurisdiction and disposition hearing on the section 387 petition, given that the evidence on the two petitions was cross-admissible. H.H.'s counsel agreed that the hearings should be set for the same date. The juvenile court set the matter for a combined hearing in August.

The contested hearing commenced on August 12, 2022, and testimony and argument were heard over the course of several nonconsecutive days. During her opening remarks, H.H.'s counsel outlined the "course of action that the Court need[ed] to consider things." According to H.H.'s counsel, "all parties [we]re in agreement that, first, we need to deal with the 388 motion that the agency filed to terminate guardianship." If the juvenile court did not terminate the legal guardianship under the section 388 petition, then, H.H.'s counsel explained, the court should address the section 387 petition. J.H.'s counsel joined in the opening statement of H.H.'s counsel, and no parties objected to proceeding in this manner.

Numerous witnesses testified at the hearing. The Agency director testified that the guardians' foster care license had been revoked based on J.H.'s drinking problem, the guardians' lack of candor about the issues in their home, and other safety concerns.

According to the Agency social worker Angela Speed in September 2021, H.H. finally told her that J.H. had abused alcohol over the past year. After implementing a safety plan where J.H. was not to be alone with E.M. or drink in his presence, Speed later observed J.H. falling down the stairs intoxicated while E.M. was in the home. She explained that the Agency had recommended inpatient and outpatient treatment plans to help J.H. achieve long-term sobriety, but J.H. did not complete treatment or otherwise satisfactorily address the Agency's concerns regarding his alcohol abuse.

8

J.H. was also dishonest about his drinking. He had initially told Speed he was laid off, but H.H. later disclosed that he had been fired because of his drinking. In Speed's view, H.H. did not always immediately disclose when J.H. was drinking. Nor did J.H. or H.H. timely disclose that J.H. was charged with and convicted of two driving under the influence related crimes.

The program supervisor for Placer County Children's System of Care testified about the CFT meeting safety plans to address J.H.'s drinking, including substance abuse treatment programs and having J.H. move out of the family home until he obtained sobriety, the guardians' failure to timely disclose important information regarding J.H.'s alcohol problems, and issues regarding E.M.'s immigration status.

The Department case carrying social worker, Shelby Campbell, was assigned to E.M.'s case in November 2021. At the time, she learned that E.M. had lost his eyeglasses. While H.H. told E.M. to clean his room to see if he could find his glasses, H.H. did not order E.M. a replacement pair of glasses until April 2022. Campbell also described E.M.'s learning deficits that should have been addressed through an IEP, and noted that although an IEP referral was made in March 2021, the guardians did not return all of the necessary referral documents to the school until January 2022.

Campbell testified that E.M. was thriving in his current placement academically and socially, and he had expressed his preference to stay with his current placement rather than return to the guardians. E.M. did not contact the guardians as frequently as he did before being moved to his current placement, although he still cared for them.

J.H. testified that he considered E.M. to be his son, and that E.M. and A.M., who remained in the guardians' care, were very bonded brothers. E.M. was also bonded to some of J.H.'s adult children and H.H.'s mother, who also lived in their home.

J.H. started drinking in September 2020 after he began having marital issues. He admitted having a problem with alcohol and that he had lost two jobs due to his drinking. Obtaining treatment was initially hard because it conflicted with his new job, but he was

currently engaged in outpatient treatment with WellSpace Addiction Recovery. He had also started attending Alcoholics Anonymous meetings in January 2022 after his drunk driving arrest, although he had not been to a meeting in about a month. He had met with church members to address his alcohol abuse, and was willing to engage in court-ordered services to maintain the guardianship. However, he conceded that even though he knew since October 2021 that he was in jeopardy of having E.M. removed from his care based on his drinking, he did not engage in consistent treatment services until April 2022, and he admitted relapsing as late as May 26, 2022. J.H. believed his family needed more visits with E.M. and that he and his wife could attend couples therapy.

H.H. testified that E.M. had been in their home about four years before he was removed; they were very close and she considered him her son. E.M. was also very close with his biological brother, A.M., for whom they still had legal guardianship. J.H. began drinking in 2020, and by November 2021, the Agency and the Department had requested that he engage in treatment or leave their home. As a result, H.H. took J.H. to live with his mother. H.H. permitted J.H. to visit with the children only when sober and while other adults were present.

H.H. acknowledged she could have done more to address what was happening in her home before E.M. was removed. She also noted that she mistakenly believed the Department or the Agency would arrange for therapy services for A.M. based on the molestation allegations, but later realized it was her responsibility as his guardian to secure the services, which she had since set up. Even though she had agreed to safety plans requiring her to notify the Department and the Agency if J.H. drank, she was not more forthcoming about J.H.'s drinking-related problems, including his driving under the influence arrest and convictions, because he had moved out of the house by November 2021. She also claimed she had sent the IEP paperwork back to school with E.M. but failed to follow-up on whether the school received it because it was the end of the school

10

year; E.M.'s IEP was delayed by almost a year after the initial referral was sent home due to the missing paperwork.

According to J.H.'s substance abuse counselor, he had actively participated in an outpatient program from April to June 2022, which consisted of individual and group telephonic sessions. He was honest about his alcohol struggles and triggers, admitted he had relapsed in May 2022, and had started a recovery services program for extra support. After assessing whether J.H. needed referrals for additional services, she determined no additional services were necessary.

A social worker investigator also testified on the guardians' behalf that she visited their home in August 2022 after E.M. had been removed and found it clean, organized, and well furnished. She felt the guardians were appropriately monitoring A.M. given the pending sexual molestation allegations and that E.M. would not be at risk if he remained in their home.

E.M.'s court appointed special advocate testified that E.M. was doing well in his current placement, he received tutoring to fill some educational gaps, and he was happy at the school he was attending. He had expressed a desire to return to his mother, and if that was not possible, to stay with his current caretaker. She recommended that E.M. remain in his current placement and not be returned to the guardians.

At the conclusion of evidence, H.H's counsel addressed the section 388 petition, although she acknowledged that her argument would largely be the same as for the section 387 petition. She agreed there were issues in the guardians' home but argued that it was in E.M.'s best interest to return him to the guardians and allow for reunification services.

J.H.'s counsel noted that counsel for all parties were "in agreement on the 388 and the 387 procedures as it applies to this case in that the Court does have the authority to both maintain the guardianship and maintain and order [E.M.] be returned to the home of the [guardians] both in the short and long-term and to order reunification services if the

11

Court deems appropriate." He also emphasized that terminating the guardianship under section 388 would effectively preclude the chance of E.M. being raised with his biological brother, A.M., with whom he shared a strong bond. Counsel acknowledged that her "section 387 argument is largely incorporated into my [section] 388 argument . . . ."

E.M.'s counsel informed the juvenile court that while E.M. cared for the guardians, he either wanted to be with his mother or stay in his current placement and not be returned to the guardians. Counsel agreed with the Department's recommendation to terminate the guardianship under section 388. In counsel's view, the guardians were not entitled to services given that the guardianship was established through dependency and not probate, and, in any event, she did not believe it was in E.M.'s best interest to offer any additional services as she did not believe it would help since the guardians failed to recognize the magnitude of the problem and address it in a timely manner.

The juvenile court issued its decision in October 2022, addressing the section 388 petition first as the parties had agreed at the outset of the hearings. After recounting the contested evidence, it found that there was clear and convincing evidence that circumstances had changed based on J.H.'s alcohol abuse and that it would be in E.M.'s best interest to terminate the guardianship. In so ruling, the court recognized that although E.M.'s legal guardianship relationship with the guardians was ending, his personal relationship with them and those in their household, including his biological brother A.M., need not. Having terminated the guardianship, the juvenile court found the section 387 petition moot.

The guardians timely appealed.

## DISCUSSION

## I

## *Forfeiture*

The guardians contend that the juvenile court erred by deciding the Department's later-filed section 388 petition to terminate the guardianship before considering the Department's previously-filed section 387 petition. The guardians have forfeited any challenge to the way the juvenile court considered the petitions below.

As our Supreme Court explained in *In re S.B.* (2004) 32 Cal.4th 1287, "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*Id.* at p. 1293.) Such a rule encourages parties to bring alleged errors to the attention of the trial court so that the court has an opportunity to correct the error. (*Ibid.*) "Dependency matters are not exempt from this rule." (*Ibid.*)

Here, neither H.H. nor J.H. objected that a section 388 petition was an improper vehicle to terminate E.M.'s guardianship under the circumstances. In fact, at the beginning of the hearing, H.H.'s counsel expressly informed the juvenile court that all parties agreed the juvenile court should first address the section 388 petition, and then, only if it denied the section 388 petition, should it proceed to decide the section 387 petition. J.H.'s counsel joined in the argument and no party objected to proceeding in the manner outlined by H.H.'s counsel. Thus, the guardians did not fail to object to the juvenile court proceeding on the section 388 petition first, they explicitly acquiesced, and indeed invited, the juvenile court to proceed in the manner of which they now object on appeal. Based on the proceedings and arguments below, the guardians have forfeited their appellate objections or otherwise invited any alleged error. (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 [forfeiture doctrine applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings]; *Fretland v. County of Humbold* (1999) 69 Cal.App.4th 1478, 1489 [a

party may not assert theories on appeal that the party did not raise in the court below]; *In re G.P.* (2014) 227 Cal.App.4th 1180, 1193 [recognizing that the doctrine of invited error can apply in the dependency context and that under the doctrine, when a party by its own conduct induces the commission of error, the party is estopped from asserting it as a grounds for reversal on appeal].)

However, even if we were to decline to apply the forfeiture rule or the invited error doctrine here (*In re S.B., supra*, 32 Cal.4th at p. 1293 [application of the forfeiture rule is not automatic and a reviewing court may exercise its discretion to reach an arguably forfeited issue]), as we explain below, the Department's section 388 petition was an appropriate mechanism to terminate E.M.'s dependency guardianship.

## II

### *Termination of a Dependency Guardianship*

H.H. contends that because the Department sought to remove E.M. to foster care, a more restrictive placement, section 387 rather than section 388 controlled. J.H. argues that because E.M.'s guardianship was created as the permanent plan under section 366.26, section 388 does not apply as the statute's plain language applies only to guardianships created under section 360. Neither argument is persuasive.

In this case, E.M.'s guardianship was established in 2019 in dependency proceedings at a selection and implementation hearing under section 366.26. Given his immigration status, E.M.'s dependency case remained open, and the court retained jurisdiction over him as a dependent child of the juvenile court. (§ 366.3, subd.(a)(3) ["[f]ollowing establishment of a legal guardianship, the court may continue jurisdiction over the child as a dependent child of the juvenile court or may terminate its dependency jurisdiction and retain jurisdiction over the child as a ward of the legal guardianship, as authorized by Section 366.4"].)

A request to modify, replace, or terminate a guardianship established by the juvenile court pursuant to section 360 or section 366.26—a dependency guardianship like

14

the one at issue here—is governed by the procedures provided in section 388 for modification of court orders.  (See *B.B. v. Superior Court* (2016) 6 Cal.App.5th 563, 569; *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1217-1218; *In re Carlos E.* (2005) 129 Cal.App.4th 1408, 1417; see also § 366.3, subd. (a)(3); Cal. Rules of Court, rule 5.740(d).)[6]  Rule 5.740(d) provides in relevant part:  "A petition to terminate a guardianship established by the juvenile court, to appoint a successor guardian, or to modify or supplement orders concerning guardianship must be filed in the juvenile court. The procedures described in rule 5.570 must be followed, and *Request to Change Court Order* (form JV-180) must be used."

"Before the hearing on the petition (where it must be shown that a change to the guardianship arises from a change of circumstances or evidence and would be in the minor's best interests, § 388, subd. (a)), the social services department shall prepare a report that includes an evaluation of whether the child could safely remain or be returned to the legal guardian's home without terminating the guardianship if services were provided.  (§ 366.3, subd. (b)(2).)"  (*In re N.B.* (2021) 67 Cal.App.5th 1139, 1145-1146.) At the hearing on the petition to terminate the guardianship, the juvenile court has three options:  (1) deny the petition to terminate guardianship; (2) deny the petition and request the county welfare department to provide services to the guardian and the ward for the purpose of maintaining the guardianship, consistent with section 301; or (3) grant the petition to terminate the guardianship.  (Rule 5.740(d)(3) (A)-(C).)  If the juvenile court grants the petition to terminate, the court may order that a new plan be developed to provide stability for the minor.  (§ 366.3, subd. (b)(2); rule 5.740(d)(4).)

This is the procedure the juvenile court followed here.  Before ruling on the section 388 petition to terminate the guardianship, the court reviewed and considered the

---

**6**      Further undesignated rule references are to the California Rules of Court.

detention findings and order, the Department's JV-180 form seeking termination, the jurisdiction and disposition report, which addressed whether services could be provided to help preserve the guardianship, a guardian assessment, and the CASA report. After considering all the evidence, the court found by clear and convincing evidence that it was in E.M.'s best interest to terminate the guardianship given the drastically changed circumstances resulting from J.H.'s unresolved alcohol abuse.

However, notwithstanding case law and commentary to the contrary (see, e.g., *In re N.B.*, *supra*, 67 Cal.App.5th at pp. 1145-1146 [section 388 applies to terminate dependency guardianship]; *In re Carlos E.*, *supra*, 129 Cal.App.4th at p. 1418 ["[a]n application to terminate a guardianship created by the juvenile court is governed by section 388"]; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2021 ed.) §§ 2.60[9], 2.181), J.H. contends that the plain language of section 388 applies only to those guardianships created under section 360 and not those, like E.M.'s, created pursuant to section 366.26.

"The juvenile court's power to appoint a guardian for a child who has been detained is governed by sections 360 and 366.26." (*In re Carlos E.*, *supra,* 129 Cal.App.4th at p. 1417.) Section 360 applies if a dependent child's parent or parents waive reunification or family maintenance services and agree to the guardianship. (*In re Carlos E.*, at p. 1417.) Section 366.26 applies when a parent fails to reunify with a child and legal guardianship is selected as the permanent plan for the dependent child. (*In re Carlos E.*, at p. 1417.)

Under section 388, "[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court or a nonminor dependent as defined in subdivision (v) of Section 11400, or the child or the nonminor dependent through a properly appointed guardian may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court or in which *a guardianship was ordered pursuant to*

16

*Section 360* for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1), italics added.) J.H. points to the above-quoted italicized language in arguing section 388 is limited to section 360 guardianships only.

But J.H. improperly focuses on a single clause of section 388 rather than considering the statutory language in context and as a whole. (*In re Z.C.* (2009) 178 Cal.App.4th 1271, 1278 [appellate court independently reviews statutory language and must harmonize the various parts of a statutory enactment by considering the particular clause or section in the statutory framework as a whole].) When all of the statutory language is considered, it is clear that anyone having an interest in a dependent child of the juvenile court may petition the court in the same action in which the child was found to be a dependent child of the juvenile court for a hearing to change, modify, or set aside any previous court order based on change of circumstance or new evidence. Because E.M.'s dependency case remained open, section 388 was available to change, modify, or set aside the juvenile court's previous legal guardianship order made under section 366.26 even if the statute also includes other types of dependency guardianships such as those created under section 360. Had the Legislature intended to preclude using section 388 to terminate a dependency guardianship created pursuant to section 366.26, it could have easily said so. It did not. And we decline J.H.'s implicit invitation to add such a limitation into the statute. (See *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 545 [reviewing "court may not broaden or narrow the scope of the [statutory] provision by reading into it language that does not appear in it or reading out of it language that does"]; *In re Hoddinott* (1996) 12 Cal.4th 992, 1002 [court may not rewrite a statute to conform to an assumed intention that does not appear from its language].)

Unlike J.H., H.H. concedes that section 388 is a viable means to terminate a dependency guardianship, but she argues that when the Department seeks to remove a minor from such a guardianship to a more restrictive placement like foster care,

17

section 387 should govern. To support her argument, H.H. relies on *In re Jessica C.* (2007) 151 Cal.App.4th 474. There, a grandparent was appointed a legal guardian after reunification efforts with a parent failed. (*Id.* at pp. 478-479.) After the guardian was unable to care for his grandchildren a few years later, the social services agency filed a section 388 petition seeking to terminate the guardianship, which the juvenile court granted. (*In re Jessica C.*, at pp. 479-480.) The appellate court reversed, concluding that petitions to terminate guardianships must follow section 387's "more detailed procedure." (*In re Jessica C.*, at p. 480, 485.)

In so holding, the court in *In re Jessica C.* relied on rule 5.740, which, as previously noted, provides that "[a] petition to terminate a guardianship established by the juvenile court, to appoint a successor guardian, or to *modify* or *supplement* orders concerning a guardianship must be filed in the juvenile court." (Rule 5.740(d), italics added; *In re Jessica C., supra*, 151 Cal.App.4th at p. 481.) The court concluded that the words "modify" and "supplement" referred to both sections 388 and 387 for petitions to modify and supplemental petitions. (*In re Jessica C.*, at p. 481.) While the court recognized that either could be used depending on the circumstances, it found that section 387 was the appropriate procedural mechanism if the termination will result in foster care. (*In re Jessica C.*, at p. 482.)

As H.H. acknowledges, however, *In re Jessica C.* was recently questioned in *In re N.B.*, *supra*, 67 Cal.App.5th at page 1139, which found that *Jessica C.*'s conclusion lacked authority and was inconsistent with the statutory scheme. (*In re N.B.*, at p. 1147.) The court in *In re N.B.* reasoned that rule 5.740, the basis for *Jessica C.*'s interpretation, provides that " '[t]he procedures described in rule 5.570 [regarding requests to change court orders under section 388] must be followed, and *Request to Change Court Order* (form JV-180 [the form required for a section 388 petition, see rule 5.570(b)]) must be used.' (Cal. Rules of Court, rule 5.740(d).)" (*In re N.B.*, at p. 1147.) Thus, because "the statute governing termination of guardianships does not mention supplemental petitions

18

under section 387 (§ 366.3, subd. (b)(2)), and the implementing California Rule of Court could not be more plain that a petition to terminate a guardianship proceeds by way of a petition to modify under section 388, it is clear that it is appropriate to proceed by such a petition." (*In re N.B.*, at p. 1147.)

We find the reasoning of *In re N.B.* more persuasive given that the plain language of section 388 does not expressly exclude the termination of a dependency guardianship where a minor may be placed in foster care and because the implementing regulations governing the termination of a dependency guardianship specifically reference the procedures under section 388 and require that the section 388 form (JV-180) be used. (§ 388; rules 5.740(d), 5.570.) The Department's section 388 petition was thus a proper mechanism to terminate the dependency guardianship regardless of whether E.M. would be placed in foster care until the juvenile court could select a more permanent plan.

Having concluded that the juvenile court here did not err in proceeding under section 388, we need not address the guardians' arguments that they were prejudiced by the procedure, including not having a separate disposition hearing under section 387 and section 361, or not being provided with reunification services, which H.H. acknowledges that the juvenile court considered and implicitly rejected even though she was not legally entitled to services as a dependency guardian. (See, e.g., *In re Jessica C.*, *supra*, 151 Cal.App.4th at p. 483.) Nonetheless, we note our disagreement with the contention that the juvenile court failed to consider E.M.'s sibling bond with A.M., who remained under guardianship with H.H. and J.H. The record does not include any such objection below, and, in any event, belies the argument.

E.M.'s close relationship with A.M. was repeatedly referenced in the evidence and arguments below. The juvenile court, moreover, acknowledged that E.M. "adored" his older brother A.M., and recognized that the Department asked it to balance the seriousness of the problems that led to E.M.'s removal and the continuing nature of the core problem over a significant period of time against the strength of the bonds between

19

E.M., the guardians, and the other members of their home, which necessarily included A.M. The court carefully considered whether removing E.M. from the guardians' custody and care in light of the significantly changed circumstances was in his best interest, including how that might impact his relationship with the guardians and his siblings. Recognizing the importance of these relationships, the court granted E.M.'s request to have twice monthly visits with H.H. and J.H., and weekly visits with A.M., despite terminating the guardianship. The court was thus well aware of, and appropriately considered, the importance of E.M.'s sibling bond with A.M. as well as his bond with the guardians.

## DISPOSITION

The juvenile court's order terminating E.M.'s dependency guardianship with H.H. and J.H. is affirmed.


                                                       /s/
                                             KEITHLEY, J.*


We concur:


/s/
EARL, P. J.


/s/
MESIWALA, J.

_____

\*      Judge of the Butte County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.